Kelley *v.* Earle et al.

Argued November 25, 1935. Before FRAZER, C. J., KEPHART, SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

*John P. Connelly,* with him *F. Gilman Spencer,* for plaintiff.

*Thomas Raeburn White,* amicus curiæ.

*George Wharton Pepper,* with him *James A. Montgomery, Jr.,* for W. W. Montgomery, Jr., intervenor.

*Albert Smith Faught,* with him *Isaac C. Sutton,* for Frederick H. Allen, amicus curiæ.

*Grover C. Ladner,* Deputy Attorney General, and *Charles J. Margiotti,* Attorney General, with them *Edward Friedman,* Deputy Attorney General, for defendants.

OPINION BY MR. JUSTICE DREW, January 6, 1936:

Plaintiff, a taxpayer, seeks in his bill to enjoin the enforcement of the Act of Assembly approved June 28, 1935, P. L. 452, known as the General State Authority Act. Defendants are the members of the General State Authority, the corporation organized under the provisions of that act. Original jurisdiction of the cause was taken upon plaintiff's petition and defendants' answer thereto, in which defendants joined in the prayer of the petition. A petition to intervene as party plaintiff and to file a supplemental bill was granted to another taxpayer. Defendants' answers to the bill of plaintiff and the supplemental bill of the intervenor admit the allegations of fact therein but deny the in-

validity of the act and the agreements proposed to be executed thereunder. A stipulation of facts has been filed setting forth (a) the form of resolution under which the authority proposes to contract with the Commonwealth for the erection of needed improvements, (b) the form of "loan and grant agreement" proposed to be entered into between the authority and the federal government, and (c) the deed of trust proposed to be executed by the authority to secure its bond issue. The issue raised upon these pleadings is whether or not the act is unconstitutional and the various agreements to be executed under it invalid.

The act provides that the governor of the Commonwealth, the state treasurer, the auditor general, the secretary of internal affairs, the secretary of property and supplies, the president pro tempore of the senate by which the act was passed, and their respective successors in office, and two citizens of the state, one to be appointed by the governor and one by the president pro tempore of the senate, are "hereby created a body corporate and politic, constituting a public corporation and governmental instrumentality by the name of 'The General State Authority.'" The purpose of the authority is the construction, improvement, maintenance and operation of "sewers, sewer systems, and sewage treatment works for state institutions, public buildings for the use of the Commonwealth at the seat of the state government, state arsenals, armories, and military reserves, state airports and landing fields, state tuberculosis sanatoria, additions to present state hospitals, normal schools, teachers colleges, penal or correctional institutions, state highways, and bridges, tunnels, and traffic circles on state highways, swimming pools, and lakes on state-owned land, and low head dams and improvements to river embankments (any and all the foregoing being herein called 'projects')." No project is to be begun after the expiration of two years from the effective date of the act. It is further provided that

"the purpose and intent of this act being to benefit the people of the Commonwealth by, among other things, increasing their commerce and prosperity, and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, none of the powers granted hereby shall be exercised in the construction, improvement, maintenance, extension, or operation of any project or projects which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes."

Certain specific powers are granted to the authority, among which are the power to exist as a corporation for 32 years, to sue and be sued, to acquire, purchase, hold, lease as lessee and use any property necessary or desirable for the purposes of the authority, to lease from the department of property and supplies any property, real, personal or mixed, or any interest therein, owned or subsequently acquired by the Commonwealth, with the approval of the governor, for a term of 99 years at a nominal rental or at such annual rental as may be determined, and, with the governor's approval, to lease as lessor to the Commonwealth or any city, county or other political subdivision, or any agency, department or public body of the Commonwealth any project constructed by the authority or property otherwise acquired by it. The authority is also given power to acquire and to construct, maintain and operate projects, to fix, charge and collect rates and rentals for the use of services of the authority or projects thereof, to borrow money and issue negotiable notes and bonds, to secure the payment of such bonds by pledge or deed of trust of all or any of its revenues, rentals and receipts, to make contracts, and to have the power of eminent domain. Section 4 finally stipulates: "Provided, however, that the Authority shall have no power at any time or in any manner to pledge the credit or taxing power of the Commonwealth or any of its cities, coun-

ties, or other political subdivisions, nor shall any of its obligations or debts be deemed to be obligations of the Commonwealth or of any of its cities, counties, or political subdivisions, nor shall the Commonwealth or any city, county, or political subdivision thereof be liable for the payment of principal of or interest on such obligations." Section 5, in providing for the issuance of bonds of the authority, states, in its third paragraph: "Any resolution or resolutions authorizing any bonds may contain provisions which shall be part of the contract with the holders thereof as to—(a) pledging the full faith and credit of the Authority (but not of the Commonwealth or any county or other political subdivision thereof) for such obligations, or restricting the same to all or any of the revenues, rentals, or receipts of the Authority from all or any projects or properties." The various remedies available to bondholders are set forth, and it is provided that, in addition to other rights and remedies, a holder of bonds of the authority may by mandamus or other action "enforce his rights against the Authority, including the right to require the Authority to collect fees, rentals, and other charges adequate to carry out any agreement as to or pledge of such fees, rentals, or other charges."

The department of property and supplies of the Commonwealth is given the power, with the approval of the governor, to acquire title in the name of the Commonwealth to any lands which may be required for the corporate purposes of the authority, and to grant and assign, or lease for a term not exceeding 99 years, to the authority any lands or rights in lands owned or acquired by the Commonwealth so far as needed or convenient for the authority's purposes. In section 14 it is provided: "The Commonwealth does hereby pledge to and agree with any person, firm, or corporation, or Federal agency subscribing to or acquiring the bonds to be issued by the Authority for the construction, extension, improvement, or enlargement of any project or

part thereof, that the Commonwealth will not limit or alter the rights hereby vested in the Authority until all bonds at any time issued, together with the interest thereon, are fully met and discharged. The Commonwealth does further pledge to and agree with the United States and any other Federal agency that in the event that any Federal agency shall construct or contribute any funds for the construction, extension, improvement, or enlargement of any project, or any portion thereof, the Commonwealth will not alter or limit the rights and powers of the Authority in any manner which would be inconsistent with the continued maintenance and operation of the project or the improvement thereof, or which would be inconsistent with the due performance of any agreements between the Authority and any such Federal agency, and the Authority shall continue to have and may exercise all powers herein granted, so long as the same shall be necessary or desirable for the carrying out of the purposes of this act and the purpose of the United States in the construction or improvement or enlargement of any project or such portion thereof."

The form of resolution contained in the stipulation of facts, under which the authority proposes to contract with the Commonwealth for the erection of needed improvements, is drawn with specific reference to a particular project. It recites the need for an improved water supply and waterworks for the State Colony for Epileptics near Selinsgrove, the cost of which is to be $50,909. The recital further discloses that the federal emergency relief administration of public works has approved the project and that, through the benefits of an act of Congress known as the Federal Emergency Work Relief Act, 45 per cent of the total cost of the construction of the project will be paid by the federal government, and the balance, $28,000, will be loaned to the authority by the federal government if satisfactory terms can be arranged. It is then resolved that the authority may enter into an agreement with the depart-

ment of welfare of the Commonwealth, and that the terms of that agreement shall in substance provide: "(a) The Commonwealth to make available the necessary site or sites, together with pipe line easement in lands upon which the project will be erected and established, to be conveyed or leased to this authority for a nominal consideration. (b) This authority to construct on the sites thus made available and transferred a complete water-works system which shall be rented to the Department of Welfare of the Commonwealth of Pennsylvania for a term not exceeding thirty years at an annual rental not exceeding $2800.00 for the first third of the term, $2520.00 for the second third of the term and $2240.00 for the balance of the term. Said lease also to provide that the Commonwealth of Pennsylvania, acting through its appropriate department or agency will keep said water-works in good order and repair and maintaining the same in operating condition. (c) That at the expiration of the term of the lease and upon payment of the rent stipulated therein, title to said water-works to be transferred or conveyed to the Commonwealth of Pennsylvania, free and clear of all encumbrances, together with the site or sites upon which the same is to be erected if the same shall have been conveyed, or with release of the lease of said sites, as the case may be." A clause, entitled "Conditions Precedent to the Government's Obligations," in the form of loan and grant agreement between the authority and the federal government, provides: "The Government shall be under no obligation to pay for any of the Bonds or to make any part of the Grant: . . . (e) If the Supreme Court of the State shall not render a decision satisfactory to the Administrator holding that: (i) Act No. 190 [the General State Authority Act] is constitutional, . . . (iv) the Lease between the Department and the Borrower is a valid, binding and irrevocable agreement, although not a debt of the State

within the meaning of any constitutional or statutory provision or limitation."

Numerous constitutional objections are raised against the act and the agreements contemplated under it. Of these we need consider only one. Section 4 of article IX of the Constitution provides: "No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or to pay existing debt; and the debt created to supply deficiencies in revenue shall never exceed, in the aggregate at any one time, one million dollars: Provided, however, That the General Assembly, irrespective of any debt, may authorize the State to issue bonds, to the amount of one hundred millions of dollars, for the purpose of improving and rebuilding the highways of the Commonwealth." We are of the opinion that the lease which the Commonwealth proposes to execute under the stipulation in the record, and other leases like it, are within the prohibition of that section. We have not often been called upon to consider the meaning and effect of section 4 of article IX. It is clear, however, that the vice intended to be prevented by it is not different from that prohibited by section 8 of article IX, which limits the indebtedness of municipalities, and which we have frequently had to consider. We pointed out in Kelley v. Baldwin, 319 Pa. 53, at page 60, that the mischief sought to be avoided by section 4 was "the accumulation of a state debt (subject to the $1,000,000 leeway for deficiency in revenue) by expenditures in excess of current biennial revenue." In Com. v. Liveright, 308 Pa. 35, it was said, at page 66: "This section was intended to restrict legislative acts which incurred obligations or permitted engagements on the credit of the State beyond revenue in hand or anticipated through a biennium, and establishes the principle that we must keep within current revenue and $1,000,000." We have likewise several times asserted that the sort of indebtedness

prohibited by section 8 was the "contractual obligation to pay in the future for considerations received in the present": see Keller v. Scranton, 200 Pa. 130, 135; Lesser v. Warren Borough, 237 Pa. 501, 508; Georges Township v. Union Trust Co., 293 Pa. 364, 372. The respective purposes of the two sections are undoubtedly parallel, and it therefore becomes relevant to consider the cases construing section 8.

It is true that a contract of a municipality which is within the current revenues of the municipality does not constitute a debt within the meaning of the constitutional restriction thereon. In City of Erie's Appeal, 91 Pa. 398, it was said, at page 403: "If the contracts and engagments of municipal corporations do not over-reach their current revenues, no objections can lawfully be made to them, however great the indebtedness of such municipalities may be; for in such case their engagements do not extend beyond their present means of payment, and so no debt is created." * Thus, a contract, the purpose of which is to meet the ordinary expenses and recurrent needs of the community, is not within the constitutional restraint (Reuting v. Titusville, 175 Pa. 512), even though the undertaking may extend beyond the current fiscal term: Wade v. Oakmont Borough, 165 Pa. 479; Scranton Electric Co. v. Old Forge Boro., 309 Pa. 73. Where it does not appear, however, that an obligation incurred by a municipality can be met out of current revenues, the obligation must be considered a debt in the constitutional sense if it in fact represents an extraordinary or capital expenditure, even though it may be arranged so as to appear to be an ordinary and usual expense: Brown v. City of Corry, 175 Pa. 528; McKinnon v. Mertz, 225 Pa. 85; Lesser

---

* See also: Spangler v. Gallagher, 182 Pa. 277, 280; Addyston Pipe & Steel Co. v. City of Corry, 197 Pa. 41, 49; Schilling v. Ohio Twp., 260 Pa. 113, 117; Georges Twp. v. Union Trust Co., 293 Pa. 364, 371; Athens Nat. Bank v. Ridgebury Twp., 303 Pa. 479, 484.

v. Warren Borough, supra; see Georges Township v. Union Trust Co., supra.

In the Brown case, the contract was for the construction of a waterworks, to be delivered to and operated by the city upon completion. Payment was to be in annual installments for 20 years, title to remain in the contractor until the city had fully performed its contract. In a "supplementary statement" it was declared to have been the original intention of the parties to the agreement that the payments were to be "payable . . . annually from the current revenues of said city and not otherwise." The contention was made for the city that the contract was merely for the supply of water and was confined to current revenues. It was none the less held that the purpose of the arrangement was the acquisition of a capital improvement and did not fall within the rule enunciated in City of Erie's Appeal, supra, concerning current revenues. Since the city's borrowing power was exhausted, the debt thereby created was invalid. A similar scheme, for the construction of a school building, was struck down in McKinnon v. Mertz, supra, notwithstanding a "supplemental agreement" attempting to restrict the indebtedness to "funds legally available." In Lesser v. Warren Borough, supra, the proposal was to construct a waterworks, to be financed by a bond issue, which was to be met solely from the revenues of the waterworks, "without other liability whatsoever" on the part of the borough. It was pointed out that, if the bonds were not paid, the waterworks, borough property, could be taken in payment. In holding the proposed undertaking a violation of the restriction on municipal indebtedness, we said, at page 513: "In determining whether any legislative or municipal act conflicts with the Constitution, its substance, and not its form, must always be the test. To sanction what the appellant proposes to do would permit municipalities burdened with debt almost up to the constitutional limit, to constantly overstep it, with results easily to

be conjectured. Public improvements which could not be made in the face of the Constitution would be made in defiance of it. To permit a borough or city to borrow money under a contract that it shall not be liable for its repayment, but that the lender must look solely to pledged municipal property or assets, would, in effect, annul the constitutional restriction upon municipal improvidence and strike down a safeguard against municipal profligacy. The Constitution is not to be thus set at naught."

In the present case, the Commonwealth proposes to construct a waterworks at its Selinsgrove institution. To that end, the Commonwealth is to give to the authority land now owned, or subsequently to be acquired, upon which the latter shall construct the waterworks with money borrowed by it. The land, with the completed waterworks and other improvements thereon, is then to be leased to the Commonwealth for a term of 30 years, at an annual rental calculated to pay the operating expenses of the authority and the interest on its bonds, and to amortize the principal of the bonds. In addition to payment of the rental, the Commonwealth shall agree to provide for the maintenance, operation and repair of the waterworks. At the end of the term, and upon full payment of the stipulated rental, the Commonwealth shall acquire full title to the land and waterworks.

It cannot be doubted that the purpose of the arrangement contemplated is the acquisition by purchase of a capital improvement or improvements, for which the state cannot now pay and payment for which is therefore to be made in annual installments extended over a period of 30 years. We are not confronted with an ordinary expenditure, nor is it a case in which the means of payment is provided at the time the obligation is incurred. The particular waterworks described in the record is but a single instance of a program of public works to which no limit has been set either by the act

or by the officers of the Commonwealth and the authority. It was stated at the bar of the court that the authority is expected to receive some $60,000,000, of which some $33,000,000 must be repaid. It is clear that the rentals to be paid by the Commonwealth for the various projects constitute the only contemplated source of revenue of the authority, apart from whatever self-liquidating projects may be undertaken. If the authority defaults, the bondholders may, under the act, compel it to enforce its agreements with the Commonwealth, and may take the property originally conveyed by the Commonwealth to the authority in payment of their claims. The engagement extends beyond the present biennium; no means of payment are presently provided; the purpose is to purchase a capital asset; and it in no way appears, nor can it be assumed, that there will be sufficient surplus revenues in this or future bienniums to meet the contemplated payments. Clearly, the Commonwealth is buying on credit and living beyond its means. The intention embodied in the constitutional restriction on debt was to preserve in the financial administration of the Commonwealth the principle of paying as it goes, subject to the specified exceptions. The proposed leases violate that principle and therefore transgress both the letter and the spirit of the Constitution.

Tranter v. Allegheny County Authority, 316 Pa. 65, is urged upon us as decisive in defendants' favor. There, however, the proposed projects were self-liquidating. The revenue for construction was to come, not from the county, but from tolls collected from users of the projects, and the sole obligation imposed upon the county was for the maintenance, operation and repair of the projects. The county undertook to pay the costs of insurance and of lighting, sweeping, cleaning, and removing snow from structures and approaches. The maintenance agreement was in fact expressly sustained on the understanding that the costs of maintenance would

be well within the county's annual current revenues, to which it was said the parties had agreed. No such agreement is shown here, nor is there any evidence to indicate that current revenues will be adequate to meet maintenance costs in the future. In view of the fact that the proposed expenditures are for capital purposes, upon which no limit has been placed, a future sufficiency of surplus current revenue may not be assumed. The Tranter case very plainly can afford no solace to defendants. It is suggested in their brief that some self-liquidating projects are contemplated under the present act. In so far as such projects are permitted by the Tranter case, no valid objection to them could be founded upon section 4 of article IX. But it must be obvious that the nature of most of the projects envisaged excludes the possibility of self-liquidation. So far as those projects are concerned, the Tranter case offers no support.

The clear premise underlying the record and briefs and the oral presentation in this case is that the scheme is to be considered as a whole, and that the particular project described in the record is merely typical of many projects, to which no limit is set. In this view of the matter, we have no doubt that a creation of indebtedness on the part of the Commonwealth in excess of the constitutional limitation is contemplated, and we therefore do not hesitate to enjoin the execution of the proposed leases, whereby such indebtedness will be incurred. It is the plain purpose of the act, and the agreements to be executed under it, to permit the Commonwealth to construct public works for which it is not now able to pay, and for which it cannot directly borrow. The attempt is to evade the constitutional restriction on debt, and, since the method proposed is illegal, it must be struck down. The fundamental law may not thus be infringed.

The bills are retained, and the injunction prayed for is granted, costs to be paid by defendants.

462

DISSENTING OPINION BY MR. JUSTICE KEPHART:

The majority opinion concedes that if the authority undertakes projects that are self-liquidating, "no valid objection to them could be founded upon section 4 of article IX," the debt limiting provision of the Constitution, but reasons that we are here confronted with a project not self-liquidating. It is to be observed that it is the application of this act to the contract to be assumed by the State, rather than the act itself, which they hold unconstitutional as to the instant or analogous facts. I join in their conclusion concerning self-liquidating projects, but I disagree with the majority's conclusion as to the constitutionality of the act as it relates to the facts in this case, and it is to these that the majority opinion must be restricted. It can be extended no further for the court had no other facts before it. Giving to that opinion this effect, it divides projects under the act into two classes: self-liquidating projects wherein the State as such is not obligated to pay the cost under any guise, and other projects where the State as such makes payment of the liquidating cost in whole or part in some fashion. I do not assume that the majority at this time would object to the federal government presenting the State with a project free of charge.

The majority opinion in the instant case concludes that, after the erection of a waterworks for an epileptic hospital, the State obligates itself to pay rent which purchases the plant at the end of thirty years, this causes an incurring of a debt in violation of the Constitution. If so, then the recent decision of this court in Tranter v. Allegheny County Authority, 316 Pa. 65, has met a premature death, for the facts of that case and the logical and necessary conclusions to be drawn from it, present a compelling legal analogy to the instant situation.

The majority opinion admits that the constitutional inhibition as to illegal debts is just as strong against a

municipality, with which we are confronted in the Trenter case, as it is against the State, with which we are here concerned.

I have carefully examined the Act of December 27, 1933, P. L. 114, as it was applied to the contract in the Tranter case and where we held it constitutional. It differs in no essential particular from the Act of June 28, 1935, P. L. 452 and its application to the contract here under consideration. Both acts set up machinery for undertaking the construction of public improvements with the financial assistance of the federal government; the composition of the several boards is immaterial.

Under the contract in the Tranter case we held that the county could constitutionally convey away various existing public improvements to the county authority though some of those improvements were state highways, the property of *the State,* in actual public use and essential to the life of the community. This authority to convey embraced not merely land but tunnels, bridges and highways. Under neither act are the obligations issued by the authority involved so as to constitute indebtedness of either unit of government. Both contracts require the costs of maintenance and repairs of the projects to be borne by the unit of government involved, although the county in the Tranter case had a much heavier burden as to repairs and maintenance.

Liquidation under the Act of 1933 was through revenues from tolls paid by the public traveling over the completed projects. Under the Act of 1935 liquidation for this one project is to be through rent received from the State for the use of the project.

The majority opinion states that here the Commonwealth would be purchasing a "capital asset" through rents payable over a number of years sufficient in amount to amortize the principal and interest of the bonds to be issued for the cost of construction, and that

the purchase of a capital asset is the creation of a debt prohibited by section 4, of article IX.

In the Tranter case the county was to convey to the authority the property necessary for the various projects and, as the highways belonged to the State, we held it could validly authorize the county to make such conveyance free of charge. This included new projects such as the Duquesne tunnel and also existing projects such as the present Liberty Tubes owned by the State and which cost millions.[1] On this property the bonded indebtedness of the authority was fastened and remains as a lien until paid when the project's "capital assets" would again become the property of the State. In that case, as here, capital assets were to be acquired by the State; in both cases the State's property given to the respective authority was put in jeopardy for any default on the bonds. In the Tranter case the tolls and charges were to be used in liquidation of the bonded debt. To that extent it was self-liquidating but this was not the only source of payment. Here, in my judgment, the parallel between the Tranter case and the instant case is definitely established. For the county, in aid of the payment of the bonds through tolls definitely assumed payment of the cost of operation, repair, maintenance, insurance, lighting, sweeping, cleaning, policing, removing snow and ventilating tunnels, and other incidentals without limitation. With, for instance, thousands of automobiles using daily the Liberty Tubes, this cost will run into many, many thousands yearly, to say nothing of other contingencies. All of this in relief of the

---

[1] The projects mentioned were: 1. Pittsburgh-Homestead High Level Bridge. 2. Highland Park Bridge and approaches. 3. Fort Duquesne Bridge and Tunnel. 4. River Front Improvements. 5. The existing Liberty Tubes. 6. Glenwood Bridge and approaches. 7. Dravosburg Bridge and approaches. 8. Jerome Street Bridge and approaches. 9. Rankin Bridge and approaches. 10. Banksville Road. 11. Saw Mill Run Boulevard. 12. Jerome Street Improvement.

bonded indebtedness. It could not be otherwise unless we apply a rule hitherto unknown to business. The county by assuming to pay all the costs attendant on these projects, bridges, tunnels and roads in the Tranter case contributed that much money to the retirement of the bonded indebtedness. The Allegheny improvements were not self-liquidating projects. But this court sustained the assumption of those charges by the county though they arise regularly every year and extend far into the future (1950) and indirectly affect the purchase of a capital asset. Why then may not the State assume to pay a rental charge over a period of thirty years?

We sustained this extraordinary charge or obligation in the Tranter case created by contract because it was within current revenues. In the Allegheny County Authority case[2] and the present case the cost or partial cost of the thing to be acquired, be it annual maintenance charge or annual rent, is equally within the normal revenues of the government—in both they are within current expenditures.

The decision in the Tranter case forecloses extended discussion. That the State may make contracts for current needs to be paid out of current revenues is unquestioned. Sufficient authority appears in other opinions filed in this case without restating them here. That the State Colony for Epileptics will require some form of water supply which may be purchased by the State as long as the State Colony for Epileptics continues to exist is also unquestioned. Although it is admitted that an undertaking to meet recurring needs of the community may extend beyond the current fiscal term (Wade

---

[2] In the Tranter case the defendant's paper books (no doubt those referred to in the opinion) stated, "the defendant is informed that the plaintiff will formally concede that the cost to the county of performing such agreement will be well within its annual current revenues."

In the present case, as has been noted, current revenue exceeds by $10,000,000 that which was estimated for the present biennium.

v. Oakmont Boro., 165 Pa. 479; Scranton Electric Co. v.
Old Forge Boro., 309 Pa. 73), the majority opinion would
outlaw rentals paid, as here, out of current revenues be-
cause property given the authority by the State is there-
after returned in improved condition, though the Tran-
ter case sustained similar obligations from current rev-
enues with like results. In both cases corporations were
created. In the Tranter case the authority sold its serv-
ice to the public that used the facilities. In the instant
case, the authority sold its service (water supply) to its
only customer, the State. Had the state authority agree-
ment provided for the same payment for service without
return of the property given by the State it would
weather the storm.[3]

A presumption of constitutionality ordinarily attends
the acts of the legislature. The burden of proving ille-
gality beyond a doubt is upon that person who alleges it
(Rettinger v. School Board of City of Pgh., 266 Pa. 67),
and there is nothing to show the expenditure of $2,000
a year will overstep the limits of the State's unexpended
current revenue. To assume that it will do so is simply
to seek a means to strike down legislation. The Com-
monwealth is entitled to the presumption that the sums
provided by this lease were within current revenues.
The obligations of the county in the Tranter case run to
1950. It is a heavy obligation, and one which the fed-
eral government may specifically enforce. I believed
then, as I do now, that so long as these outlays do not
exceed annual current revenues no debt within the con-
stitutional sense is created. Petitioners having failed to
demonstrate that in this case these expenditures would
exceed current revenues that have been appropriated, the
court is bound to presume that they are within them.

I can view the majority opinion in no other light than
that the Tranter case is overruled; to hold that what

[3] Wade v. Oakmont, 165 Pa. 479; Scranton Electric Co. v. Old
Forge, 309 Pa. 73.

was done there cannot be done here is to deny to the Tranter case its force and effect.

DISSENTING OPINION BY MR. JUSTICE MAXEY:

The majority opinion holds the General State Authority Act breaches the state Constitution in only one respect and that is, that it creates a debt contrary to the prohibition of section 4, article IX, of the Constitution. On the record now before us—and that alone is what our decision must be based on—I am clear that section 4, article IX, is not breached and I dissent from the conclusion arrived at by the majority.

The majority says: "We are of the opinion that the lease which the Commonwealth proposes to execute, . . . *and other leases like it* [italics supplied], are within the prohibition of that section [section 4, article IX]." In my judgment, this court, in passing on the question whether the expenditures involved in the single lease on this record are unconstitutional, a lease calling for a maximum rental of only $2,800 a year, has no right whatsoever to consider the effect on our state revenue of "other leases like it." No such other leases are before us. We know nothing of their terms and for all that appears they may all be leases on self-liquidating projects. Whatever they prove to be is no concern of ours *at this time*. When the State proposes to enter into other leases with the General State Authority, *then and not until then* will the court have any power to pass on the constitutionality of the expenditures they call for.

In connection with the question here, there are at least two relevant things which are absolutely settled in the law. The first is the meaning of "debt" as used in section 4, article IX. It does *not* mean an obligation arising from the acquisition of something the State does not pay cash for at the moment of acquisition. If the State acquires something to-day which can be paid for a little later out of current revenues that is not a debt within the constitutional prohibition quoted. Mr. Justice

MITCHELL, speaking for this court, made that very clear in Keller v. Scranton, 200 Pa. 130, 49 A. 781. This court in Com. v. Liveright, 308 Pa. 35, 161 A. 697, made it clear that the debts prohibited by the constitutional provision quoted were those "beyond revenue in hand or anticipated through a biennium." It is firmly-established law that if current revenues are not overreached by an obligation incurred, that obligation is not a debt within the meaning of the constitutional prohibition cited.

A second question arising here and which is absolutely settled in this State is that he who asserts that an act is unconstitutional has the burden of proving it. In Erie & North-East R. R. Co. v. Casey, 26 Pa. 287, this court, speaking through Mr. Justice BLACK, said: "The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases; one department of the government is bound to presume that another has acted rightly. The party who wishes us to pronounce a law unconstitutional, takes upon himself the burden of proving, beyond all doubt, that it is so."

In the case of Com. v. Moir, 199 Pa. 534, 49 A. 351, this court, in an opinion by Mr. Justice MITCHELL, held that where the power which is exercised is legislative in its character, the courts can enforce only those limitations which the Constitution imposes; not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism and sense of justice of their representatives.

In the instant case, we have a statute which was passed unanimously by both houses of the General Assembly of Pennsylvania and approved by the governor. The judgment of everyone constituting the executive and legislative departments of the government was in favor of this act. If we are to strike it down, it must be because the facts under the Constitution clearly demand it. Since we have no proof offered that the debt incurred

in the instant case will be beyond the current revenues, we must *presume* that the debt incurred is within the current revenues. This being so, the act does not breach the constitutional provision invoked.

There is nothing in Brown y. Corry, 175 Pa. 528, 34 A. 854, cited by the majority opinion, which supports in the slightest degree the conclusion reached in that opinion. In that case the court clearly pointed out that "the indebtedness of the city [of Corry] now existing exceeds the constitutional limit." The limit then referred to was the one imposed by section 8, article IX, of the Constitution, providing that "the debt of any county, city, borough, township, school district, or other municipal or incorporated district, except as herein provided, shall never exceed 7% of the assessed value of taxable property therein. . . ."

The contract proposed to be entered into in that case was one to purchase the plant of a waterworks, to be paid for by 20 annual installments out of the "current revenues and not otherwise" of the city. The court below, starting with the fact that the then indebtedness exceeded the constitutional limit, said the question whether the city under the proposed contract was incurring a debt prohibited by section 8, article IX, of the Constitution, depended upon the answer to the question: "Is its purpose to provide for the paying of what may be called a part of the ordinary expenses? If the answer is 'yes,' it is within the power of the council to enter into if it is, 'together with other like expenses, within the limits of its [the city's] current revenues.'" The court said further that "when a contract made by a municipal corporation pertains to its ordinary expenses, and is, together with other like expenses, within the limit of its current revenues, and such special taxes as it may legally and in good faith levy therefor, such contract does not constitute the incurring of an indebtedness within the meaning of the constitutional provision limiting the power of municipal corporations to contract debts." The

470

lower court then added: "Our own Supreme Court has said, 'This is a sound constitutional interpretation,' and its reason must be apparent to all. The ordinary expenses, at least many of the ordinary expenses, must be incurred and paid, or the city cannot exist. It cannot be supposed that the framers of the Constitution intended to prevent municipalities from deriving the benefit that may accrue from favorable contracts for a term of years for supplying what must certainly be had, and must be otherwise provided for annually, at perhaps additional expense and inconvenience. And any expense that recurs with regularity and certainty, and is necessary for the existence of the municipality or for the health, comfort and perhaps convenience of the inhabitants, may well be called an ordinary expense."

The court then held that the purchase of the waterworks on an installment plan was not an "ordinary expense," and *that since the constitutional debt limit for the city was already exceeded,* the city could not go into debt further for this "extraordinary expense." This court in a per curiam opinion sustained the conclusion of the court below.

Applying the logic of the opinion in that case, it makes no difference in the instant case whether the proposed lease is for a water supply or is for the purchase of waterworks on the installment plan so long as the stipulated payments are within the current revenue and therefore not a debt within the meaning of section 4, article IX, of the Constitution. As we have already pointed out, those who assert that the obligations of the proposed lease create a debt which overreaches current revenues, must prove it. Not a particle of such necessary proof has been offered in this case by those who attack the constitutionality of the proposed expenditure, or by any one else. On that phase of the case the record is totally barren.

The majority opinion says: "It cannot be doubted that the purpose of the arrangement contemplated is the

acquisition by purchase of a capital improvement or improvements, for which the State cannot now pay and payment for which is therefore to be made in annual installments extended over a period of 30 years. We are not confronted with an ordinary expenditure, nor is it a case in which the means of payment is provided at the time the obligation is incurred." The answer to that is that for aught that appears on this record the Commonwealth could agree to pay the entire cost of the Selingsgrove project, which is only $50,909, within one biennium without incurring such a debt as is prohibited by article IX, section 4, of the Constitution. The State does not have to prove its solvency every time it incurs a financial obligation. To hold otherwise would be to assert that every time the State leases a liquor store or other building for a term of years and some taxpayer objects, the Commonwealth must go into court and prove that its current revenues and prospective revenues will be sufficient to meet the obligations incurred. A statement was made at bar, without contradiction, that the proposed rentals of the Selingsgrove project are not beyond the current revenues. It is a matter of official record in this Commonwealth that the rentals paid by this Commonwealth for the fiscal year, June 1, 1934, to May 31, 1935, for the rental of real estate was $894,297.79. This included rentals paid for the leasing of State Liquor Stores, this alone amounting to $466,231.06. The citation of these figures shows the absurdity of the contention that an annual rental ranging from $2,240 to $2,800 a year will be so far beyond the current revenues of the State as to amount to the incurring of a debt prohibited by article IX, section 4, of the Constitution.

The majority opinion says further: "The particular waterworks described in the record is but a single instance of a program of public works to which no limit has been set either by the act or by the officers of the Commonwealth and the authority. It was stated at the bar of the court that the Authority is expected to receive

some $60,000,000, of which some $33,000,000 must be repaid." I submit that this court cannot decide present cases upon statements made at bar as to someone's future expectations. If the state authority is expected to receive $60,000,000 from the federal government and attempts to obligate the State to pay back $33,000,000 of that sum in thirty, or more or fewer, annual installments as rentals for structures not yet even blue printed, the time to rule on the constitutionality of the obligations which the State may *then be asked to assume is when such obligations are about to be entered into and when their precise nature and extent are on the record then before us.*

The majority opinion calls attention to the fact that there is "a clause, entitled 'Conditions Precedent to the Government's Obligations,' in the form of loan and grant agreement between the authority and the federal government [and this] provides: 'The government shall be under no obligation to pay for any of the bonds [of the state authority] or to make any part of the grant: . . . (e) If the Supreme Court of the State [of Pennsylvania] shall not render a decision satisfactory to the administrator holding that: (i) Act No. 190 [the General State Authority Act] is constitutional." As I read the majority opinion, the clause just cited is construed by the majority as making it obligatory on this court to determine *now* the constitutionality of the General Authority Act in "a decision [which may or may not be] satisfactory to the administrator, holding that the act is [or is not] constitutional." The answer to that is that not even the federal government can command this court to decide the constitutionality of any act of our assembly prematurely. We decide the constitutionality of acts only when the record before us raises such a question. The majority opinion does not hold the State Authority Act intrinsically unconstitutional. All the alleged eight pleaded breaches of the Constitution are found to be nonexistent, save one—and that one becomes

visible to the judicial eye only when a department of the state government executes a lease with the authority to supply water for thirty years to the state's epileptic wards, in one colony, at a cost slightly in excess of $200 a month. To me the invalidation of this act for this reason appears absurd. It is settled law in this Commonwealth that no state expenditures can be construed as creating a debt within the prohibitions of section 4, article IX, of the Constitution, *until facts are presented showing that such expenditures will overreach current revenues.* This court has nothing before it now on which to base a determination as to whether any future lease or leases which the State may attempt to enter into with the authority, will involve expenditures amounting to a constitutionally prohibited debt. That is fundamentally a problem in arithmetic and one does not normally proceed to a solution of mathematical problems until all the factors are presented. The duty of presenting facts supporting an assertion that a state obligation imposes an unconstitutional strain on current revenues rests exclusively upon the asserter.

I can see no application to the question presented here, of the common-law maxim that "acts of parliament derogatory from the power of subsequent parliaments, bind not." (Blackstone, volume 1, page 91.) That simply means that if one legislature or one parliament passed a law defining some crime and providing for its punishment, it could not in such an act, by any language, prevent a succeeding parliament from repealing it or modifying it. Likewise, if one legislature passed a law providing for a certain devolution of property, it would have no power to make that law irrepealable or unamendable. The very illustrations Blackstone uses as applications of the maxim he cites prove that the maxim has only that application herein stated and no other. This maxim, if given full acceptation, does not mean that the legislature of Pennsylvania cannot authorize the State as a body-corporate to enter into any contracts

for more than two years' duration. If that were the law, a state could not issue valid bonds for terms longer than the life of a legislature, and a city could not issue valid bonds for a term longer than the life of a city council. If this were the law, it would mean that the State could not enter into a contract for a public improvement that could not be completed within a period of two years. It could as well be argued that the legislature could not create any salaried public position for a term longer than a single biennium of the legislature.

The efficient administration of government frequently requires that business contracts be entered into by the State as a body-corporate for a longer period than two years. It is a matter of common knowledge that the State frequently leases buildings and office space for a longer period than two years. No one has ever suggested that such an administrative act when authorized by the legislature was an unconstitutional attempt by the legislature to derogate from the power of succeeding legislatures.

In considering the laws of a state as related to questions such as the one now before us, and particularly in considering the question of the right of one legislative body to bind its successors, one must keep in mind the distinction between, on the one hand, those laws which are intended to govern the relations of citizens with one another and to define the rights of property, and, on the other hand, those laws which relate to the business of a state as a body corporate. In a book greatly respected by the legal profession, to wit, "Law, Its Origin, Growth and Function," written by James C. Carter, that eminent lawyer said (page 116) : "We find from the numerous volumes of statute books vast masses of matter which, though in the form of laws, are not law in any proper sense. These consist in the making of provision for the maintenance of the public works of the State, for the building of asylums, hospitals, schoolhouses, and a great variety of other similar matters. This is but the

record of the action of the State in relation to the *business* in which it is engaged."

This dual capacity of bodies corporate has often received judicial recognition in the case of municipal corporations. In 43 C. J., section 290, 272, it is said: "A municipal corporation acts and functions in a dual capacity, one governmental, the other municipal."

That municipal corporations acting in their ministerial or business capacity may enter into long-term contracts is well recognized. In 44 C. J., section 2127, 72, it is said: "In the absence of limitation either by charter or general statute, contracts have been sustained as valid when made for a reasonable term of years, three, ten, twenty, twenty-one, twenty-five, thirty, and even thirty-one years being held not unreasonable."

In Seitzinger v. The Boro. of Tamaqua et al., 187 Pa. 539, 41 A. 454, this court held: "The passing by a borough council of a resolution awarding a contract for lighting streets is not a legislative, but a ministerial act 'in the nature of a business transaction relating to the municipal affairs of the borough.'" In that case this court said: "In Black v. Chester City, 175 Pa. 101 [34 A. 354], and in Metropolitan Elec. Co. v. City of Reading, 175 Pa. 107 [34 A. 565], the sole question raised was stated thus: 'Has a city of the third class, incorporated under or governed by the Act of May 23, 1889, P. L. 277, the right to enter into a contract for lighting its streets for a term of five years?' The decision of the question depended upon the construction of the act referred to in it. We held that such cities may lawfully make such a contract. As bearing on the question whether prior to the Act of 1889 cities and boroughs, not expressly or by implication restricted to contracts for one year by the statutes under which they were incorporated or by other statutes applicable to the government of them, could lawfully enter into contracts for a term of years, we refer to City of Erie's App., 91 Pa. 398, and Wade v. Oakmont Boro., 165 Pa. 479 [30 A. 959]. In each of the

cases cited the contract in question was for a term of years, and in each it was decided that 'if the contracts of municipal corporations do not overreach their current revenues no objections can be lawfully made to them.' We may add, as showing the trend or consensus of opinion on this subject, that in Metropolitan Elec. Co. v. City of Reading, supra, the learned counsel for the appellant presented a list of thirty-four cities and boroughs in Pennsylvania which had then entered into contracts for lighting the streets for terms exceeding one year, which list appears in 175 Pa. on page 109." See also Scranton Elec. Co. v. Old Forge, 309 Pa. 73, 163 A. 154.

It follows that if the legislature can authorize municipalities to enter into long-term contracts, in the efficient administration of the purely business affairs of government, as distinguished from purely governmental, the legislature can itself authorize a commonwealth, whose legislative arm it is, to enter into contracts for more than two years for furnishing water to institutions administered by the State. What the legislature's creatures (cities) may do, the legislature itself ought to be able to do.

It may be, as argued, that "an existing legislature cannot bind succeeding legislatures to raise the revenue necessary or to make the appropriations to meet the periodic payments provided by the state's contract with the Authority." That is a risk that the authority has to run, just as a judge or any other public officer who is appointed or elected for a term of years has to run the risk that some future legislature may not appropriate money sufficient to pay his salary. That fact, however, would not make the "debt" incurred by his appointment or election for a term of years a breach of the constitutional provision against the incurring of debts in excess of current revenues. As a matter of fact these future rentals provided for in the proposed lease merely become "fixed charges" of the Commonwealth, like salaries of its public officials, and we can take judicial notice of the fact that

the fiscal affairs of this Commonwealth have never been so recklessly conducted as to make the State's *fixed* charges so great as even to approach the exhaustion of current revenues. Most of a state's appropriations are not for such charges.

With the wisdom of the Authority Act this court has nothing to do. The wisdom of statutory enactments is *always* for legislative determination, and as to the wisdom of this act the entire membership of both houses of the General Assembly was a unit. Courts pass on legislative power, never on legislative wisdom. I have no doubt of the power of the legislature to pass the General Authority Act and no doubt of the validity of the single rental contract challenged in this record. Since what the respondents are attempting to do in the instant case, under the authority of that act, to wit, bind the State to pay for thirty years, rentals ranging from $2,240 to $2,800 a year, for a proper purpose, does not impinge in the slightest degree upon any provision in the Constitution, the injunction asked for should be refused. What expenditures of public moneys may be attempted in the future, under the same act, we do not now know, and we can pass on the validity of such potential expenditures only when we, in an appropriate proceeding, are confronted with attempts to obligate the State to make them.

DISSENTING OPINION BY MR. JUSTICE BARNES:

I dissent from the opinion of the majority in this case upon the ground that the act of assembly approved June 28, 1935, P. L. 452, known as the General State Authority Act, imposes no obligations or agreements on the part of the Commonwealth which in a constitutional sense would violate the limitation on debt provided in section 4, of article IX, of the Constitution. Unfortunately, there can be no other effect given the majority opinion in this case than that it reverses, at least by implication, the very recent decision of this court in

Tranter v. Allegheny Co. Authority, 316 Pa. 65, where the act there under review is substantially similar to that with which we are here confronted. There is no escape from the conclusion that the best authority in Pennsylvania to sustain the validity of the present act is the decision of this court in the Tranter case, and as such, should be a controlling precedent for it in every sense. These two cases should stand or fall together. The majority opinion should frankly and consistently reverse the decision of the court in the Tranter case in express words. There is no weight to the argument that there are vital differences between the Allegheny County Authority, and the General State Authority Acts. Save in minor particulars only may variances be discovered therein. It is apparent on the face of the two acts that they are similar, not only in the language employed, but also in their fundamental conceptions, objects and purposes.

In the Tranter case, as here, a public corporation was created for the purpose of constructing, maintaining and operating public projects, the construction of which was to be financed by a gift from the federal government of part of the cost and a loan by that government of the balance. As in the case before us, bonds of the authority were to be issued to the federal government in the amount of the loan, and as security therefor the authority was authorized to pledge revenues from the projects. Property of the county, already devoted to public purposes, was to be conveyed to the authority for use in connection with the projects. The property held by the authority and the obligations issued by it were by the act exempted from taxation, and it was further provided that the authority should have no power to pledge the credit of or create any debt of the Commonwealth or any county or other municipality thereof. The act likewise stipulated that neither the Commonwealth nor any political subdivision thereof should diminish or impair the authority's power to own and control its properties or to

levy and collect tolls, rents and other charges in connection therewith, so long as any of its obligations remained unpaid and until adequate provision was made by law for the protection of persons advancing money upon these obligations. After the cost of all of the projects and improvements had been fully paid, the properties which had been conveyed to the authority, together with the improvements thereon, were to revert to and become the property of the county, without cost to the county. The only difference between the arrangement in that case and the one in the present case, in no way affords a valid reason for arriving at a diametrically opposite result. The projects there proposed were to be self-liquidating—i. e., the bonds of the authority were to be paid out of revenues collected from the users of the improved facilities. In the case before us, while some of the projects are to be self-liquidating, others, it is contemplated, will be paid for, at least in part, by rentals from the Commonwealth. This one ground of differentiation of the two acts, when analyzed, offers no real basis for distinguishing the two cases.

These proposed rentals afford the principal ground of attack upon the General State Authority Act, the argument being that they constitute an indebtedness of the Commonwealth in violation of the constitutional restriction thereon.

In the Tranter case we said, at page 75: "In dealing with the objections to the validity of the statute, it is necessary to keep in mind the rule, stated in Sharpless v. Mayor of Phila., 21 Pa. 147, 164, and frequently repeated since, 'that we can declare an act of assembly void, only when it violates the Constitution *clearly, palpably, plainly;* and in such manner as to leave *no doubt* or hesitation in our minds.' " We likewise pointed out, by quoting from Com. v. Reeder, 171 Pa. 505, 513, that, except in the fields of power specifically granted to the United States, and except for the specific restraints imposed by the Constitution of the Commonwealth, the

"right of the people through the legislature to enact such laws as they choose, is absolute. Of the use the people may make of this unrestrained power, it is not the business of the courts to inquire. We peruse the expressions of their will in the statute; then examine the Constitution and ascertain if this instrument says, 'Thou shalt not,' and if we find no inhibition, then the statute is the law simply because it is the will of the people and not because it is wise or unwise." In answer to the argument that the creation of the authority was a fiction designed to evade the constitutional restrictions on indebtedness, Justice LINN well said in the Tranter case, at page 84: "It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it." These observations are equally pertinent and of equal force here.

It seems that the principal objection raised against the General State Authority Act is that it is in violation of section 4, of article IX, of the Constitution. That section provides: "No debt shall be created by or on behalf of the State, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the State in war, or to pay existing debt; and the debt created to supply deficiencies in revenue shall never exceed, in the aggregate at any one time, one million dollars; Provided, however, that the General Assembly, irrespective of any debt, may authorize the State to issue bonds, to the amount of one hundred millions of dollars, for the purpose of improving and rebuilding the highways of the Commonwealth."

Under the provisions of section 4 of the act before us, the General State Authority has no power to pledge the credit or taxing power of the Commonwealth, and none of its obligations may be considered obligations of the Commonwealth. This reads as follows: "Provided, however, that the Authority shall have no power at any time or in any manner to pledge the credit or taxing power of the Commonwealth or any of its cities, counties, or other

political subdivisions, nor shall any of its obligations or debts be deemed to be obligations of the Commonwealth or any of its cities, counties, or political subdivisions, nor shall the Commonwealth or any city, county, or political subdivision thereof be liable for the payment of principal of or interest on such obligations." The authority thus cannot of its own motion impose obligations upon the Commonwealth. The argument is made, however, that, under the proposed scheme, the authority will lease projects to the Commonwealth, which will in turn maintain the projects and pay the stipulated annual rentals therefor for a period of 30 years, at the conclusion of which the projects will be conveyed in fee to the Commonwealth. The necessary implication of this arrangement, it is claimed, is that the Commonwealth undertakes to pay the stipulated rentals, as well as pay for maintenance and upkeep of the projects, and that this obligation constitutes a debt within the meaning of section 4 of the Constitution, supra.

We must therefore consider whether, under the facts before us, any such invalid obligation is imposed upon the Commonwealth. Only one project is outlined in the record—the proposed waterworks at Selinsgrove. As indicated above, the obligation which it is contemplated the Commonwealth will assume in connection therewith, is the promise to pay the stipulated annual rentals, which are not to exceed $2,800 for the first third of the term, $2,500 for the second third, and $2,240 for the balance of the term. A further obligation will arise from the promise to maintain the waterworks. It was stated at the bar of the court, without contradiction, that the revenues of the Commonwealth in the present biennium will exceed expected revenue already appropriated by some fourteen millions of dollars.[1]

---

[1] By stipulation between counsel filed of record, for which permission was given at bar, an estimate of the Secretary of Revenue of the Commonwealth was furnished by which it appeared that

In the recent case of Kelley v. Baldwin, 319 Pa. 53, we held that where the amount of an obligation of the Commonwealth is restricted to current revenues, it is not invalid under said section 4, of article IX. In that case we said, at page 60, speaking of the validity, under section 4, of tax-anticipation notes payable out of current revenues: "The prohibited mischief was the accumulation of a state debt (subject to the $1,000,000 leeway for deficiency in revenue) by expenditures in excess of current biennial revenue. Unless a challenged debt is within that prohibition, it is permitted. The creation of these notes for payment out of current revenue adds nothing to the state debt as defined." Since City of Erie's App., 91 Pa. 398, it has been settled that a contract of a municipality which is within the current revenues of the municipality does not constitute a debt within the meaning of the constitutional restrictions thereon. It was there said, at page 403: "If the contracts and engagements of municipal corporations do not overreach their current revenues, no objections can lawfully be made to them, however great the indebtedness of such municipalities may be; for in such case their engagements do not extend beyond their present means of payment, and so no debt is created." In Athens Nat. Bank v. Ridgebury Twp., 303 Pa. 479, we stated, at page 484: "A temporary borrowing in anticipation of current revenue and to be repaid therefrom is not an increase of indebtedness prohibited by the Constitution."

Nor would the Commonwealth's obligation be invalidated by the fact that it contemplated payments beyond

---

based upon the experience in the six months' period from June 1, 1935, to November 30, 1935, the revenue of the following taxes indicate an excess of actual receipts over budget estimates as follows: Cigarette tax, $2,500,000 per year, or $5,000,000 for the biennium; gasoline tax, $1,000,000 per year, or $2,000,000 for the biennium; excess profit on liquor stores, $1,500,000, or $3,000,000 for the biennium. He certified that from all sources of state revenue the excess for the biennium will be not less than $4,000,000.

the present biennium. A long-term obligation of a municipality, payable in periodic installments, is not a debt within the meaning of the constitutional provisions relating thereto where the amount of the periodic payments is clearly within the municipality's ability to pay from current revenues: Wade v. Oakmont Boro., 165 Pa. 479; Scranton Elec. Co. v. Old Forge Boro., 309 Pa. 73.

It is plain, therefore, that in so far as an obligation of the Commonwealth is within its ability to pay from its current revenues, and thus entails no expenditure in excess of such revenues, it is not within the prohibition of section 4, of article IX, of the Constitution. Such an obligation is wholly in accord with the "pay-as-you-go" principle, the preservation of which in the financial administration of the Commonwealth is said to be the purpose of the limitation on debt. There could be no objection to an obligation the payment of which was provided for when the obligation was incurred, or which was restricted to the current revenues available at the time payment fell due.

In Com. v. Snyder, 279 Pa. 234, 242, we said at page 239: "When the constitutionality of an act of assembly is attacked, it is the duty of every judge,—without regard to his opinion as to the necessity for the statute, or its wisdom,—to seek a construction which will support the legislative interpertation of the Constitution, and an act can never properly be declared void unless this is found to be impossible." We there held that the portions of the act involved under the facts before us were constitutional but expressly reserved decision as to the situations not presented by the record.

It cannot be maintained that the General State Authority Act itself, in so far as it is to be applied in the transaction set forth in this record, imposes upon the Commonwealth an obligation in violation of the constitutional restriction on debt. The obligations and agreements of the authority do not themselves constitute obli-

gations of the Commonwealth. The proposed annual rental to be paid by the Commonwealth for the waterworks here described is not to exceed $2,800 at any time during the term. It would be futile to say that this rental, or in fact the maximum total rental for the life of the lease ($75,600), could not be met out of the current revenues of the Commonwealth, particularly when it is remembered that the surplus unappropriated revenues of the present biennium should amount to fourteen millions of dollars.

It would seem equally fair and more reasonable to anticipate that funds will be on hand in current revenues of future years to meet the payments required, as to suppose there will be no such adequate revenues. To predicate the decision of this case upon that conclusion, which involves rather a fiscal than a legal question, is to disregard the common experience of past years during which the current revenues of the Commonwealth have enabled it, not only to pay its ordinary governmental expenses, but in addition thereto, as it is of common knowledge, to make grants in sums aggregating millions each biennium to worthy and needing hospitals, schools, colleges and charitable institutions. Moreover, it should be taken into account that included within the term "ordinary governmental expenses" (See Com. ex rel. v. Liveright, 308 Pa. 35, 66) are large sums for rental of offices, buildings, and properties necessary to house the activities and operation of the state government and its agencies. The buildings to be erected as projects under this act will undoubtedly be a factor in assumption and relief of at least a portion of the rentals paid.[2]

---

[2] It may be here stated that the Department of Property and Supplies of the Commonwealth reports that the total rentals for space paid by the Commonwealth during the fiscal year expiring May 31, 1935, amounted to the sum of $874,734.26; that for the fiscal year of 1936, due to the increase in the number of stores opened by the State Liquor Control Board, it is estimated such total rentals to be paid will aggregate $1,150,000.

The cost of maintenance of the waterworks does not appear, but it may reasonably be supposed that it, too, will be well within current revenues, and if this is so, an obligation on the Commonwealth's part to pay to that extent would clearly be valid. It was on that ground that an agreement of maintenance by the county was sustained in the Tranter case. It there appeared that the parties had agreed "that the cost to the county of performing such agreement will be well within its annual current revenues." In reference thereto we stated, on page 89: "On that understanding we sustain the agreement [of maintenance]; the costs of operation, repairs and maintenance described above can never exceed the annual current revenues applicable thereto. . . . If these annual expenditures are made out of current revenues, the obligation to make them is not a debt within the constitutional sense."

We should go no further, however, than to sustain the act to the extent to which obligations incurred under it by the Commonwealth are limited to current revenues. The act provides a structure whereby the Commonwealth may enter into restricted undertakings within current revenues. To this extent it must be held valid. This is effected under the act before us without in any sense permitting the legislature or any branch of the executive to depart from the principle that the obligations of the Commonwealth shall, subject to the specified exceptions, be kept within the limits of current biennial revenue, so long as that principle remains in our Constitution.

In this view of the matter, whether or not the proposed arrangement between the authority and the Commonwealth be considered a lease, or an acquisition by purchase of a capital asset, is of no consequence. To the extent that the contemplated payments are kept within the bounds of the current revenues available as the payments fall due, the Commonwealth is fully within the principle of paying as it goes. Where it does

not appear that an obligation incurred by a municipality can be met out of current revenues, the obligation must be considered a debt in the constitutional sense: Brown v. City of Corry, 175 Pa. 528; McKinnon v. Mertz, 225 Pa. 85; Lesser v. Warren Boro., 237 Pa. 501. This must be true regardless of the purpose for which the obligation was incurred. In those cases it was not shown that the amount of the periodic payments which the municipality contracted to make would in fact be within its current revenues, and, since that amount was in excess of the indebtedness authorized by the Constitution, the contract was invalid. Where, however, it is clear that the amount of the obligation is in fact within current revenues, or where it is reasonably thought to be so when the obligation is incurred (see Addyston-Steel Co. v. City of Corry, 197 Pa. 41; Schilling v. Ohio Twp., 260 Pa. 113), the mischief which the restriction on debt is intended to prevent is avoided, and a further inquiry as to whether the expenditure is an ordinary or an extraordinary one is beside the point. Nowhere in our cases is it expressly held or said that an obligation which is within current revenues is nevertheless invalid unless it involves only an ordinary expenditure. Any such rule would be unsound.

The real question is whether or not a debt is incurred, and, if it in fact appears that current revenues will be available to meet the required payment when it falls due, no debt in the constitutional sense is created. If it appears or is reasonably thought that the Commonwealth will have on hand thirty years hence available current revenue to the extent e. g. of $2,240, a promise now made to apply that revenue to the rental of this waterworks is not a debt within the constitutional sense since it is not beyond the Commonwealth's ability to pay. The situation intended to be prevented by the restriction on the debt of the Commonwealth is that in which the Commonwealth, having promised to pay, has no available revenue with which to meet the payment

when it falls due. Accordingly, where it is reasonably certain at the time the obligation is incurred that the Commonwealth will have sufficient revenue to meet future payments as they become due, the vice of incurring indebtedness beyond available means of payment is not present. In the present case, it cannot be doubted that the Commonwealth will have sufficient available revenue to meet the payments stipulated. It follows that no debt is incurred, and the prohibition of section 4 of article IX is not transgressed.

I think the bills should be dismissed. Therefore I dissent.