GEORGE J. McCUTCHEON, PLAINTIFF-APPELLANT, v. STATE BUILDING AUTHORITY, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY; THEODORE D. PARSONS, ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY; WILLIAM J. DEARDEN, DIRECTOR OF THE DIVISION OF MOTOR VEHICLES OF THE STATE OF NEW JERSEY; WALTER T. MARGETTS, JR., TREASURER OF THE STATE OF NEW JERSEY; FRED V. FERBER, DIRECTOR OF THE DIVISION OF PURCHASE AND PROPERTY IN THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY; AND PRENTICE REALTY CO. OF TRENTON, A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.

Argued April 27, 1953—Decided June 8, 1953.

*Mr. Walter H. Jones* argued the cause for the plaintiff-appellant.

*Mr. George Warren* argued the cause for the respondent State Building Authority.

*Mr. Theodore D. Parsons,* Attorney-General, *pro se* and for respondents William J. Dearden, Walter T. Margetts, Jr. and Fred V. Ferber, in their respective official capacities, and *Mr. Frederic G. Weber,* Deputy Attorney-General, joined in the appellant's brief (*Mr. Arthur J. Sullivan, Jr.,* on the brief).

The opinion of the court was delivered by

HEHER, J. The basic question here is the constitutional integrity of *chapter* 255 of the *Laws of* 1950, as amended by *chapter* 224 of the *Laws of* 1952. *L.* 1950, *p.* 873; *L.* 1952, *p.* 760; *N. J. S.* 52:18A–50, *et seq.*

The contention is that the act infringes *Article* VIII, *Section* II, *paragraphs* 1, 2 and 3 of the *State Constitution* of 1947, forbidding loans of the State's credit, regulating the appropriation of monies for the support of the State

Government, and prescribing a debt limitation; *Article* IV, *Section* I, *paragraph* 1, vesting the legislative power in the Senate and General Assembly; and *Article* IV, *Section* VII, *paragraph* 8, banning "private, special or local law" save on public notice.

As stated in the amended title, the act is designed "to provide additional buildings for the use" of the State "and departments, agencies, and instrumentalities of the State, in connection with the conduct of the State's business and functions and of the business and functions of such departments, agencies, and instrumentalities of the State and to establish the State Building Authority for that purpose"; and to authorize "such departments, agencies, and instrumentalities of the State to enter into leases and contracts with the State Building Authority relating to such structures, space, buildings and facilities."

There was "created and established in the Department of the Treasury" a body corporate and politic with "corporate succession," to be known as the "State Building Authority." The Authority was constituted "an instrumentality exercising public and essential governmental functions"; and it was provided that "the exercise by the Authority of the powers conferred" by the act "shall be deemed and held to be an essential governmental function of the State." *Section 2.* These are the specific purposes of this statutory creation: The acquisition, construction, furnishing and operation of "a State office building" in Trenton, an administrative building or buildings "for the use of the offices of the State Department of Education on the campus of the New Jersey State Teachers College" at Trenton, "motor vehicle inspection stations at a site or sites specified by the Director of the Division of Motor Vehicles and approved by the Attorney-General and the State House Commission, State Police barracks at a site or sites specified by the Superintendent of State Police and approved by the Attorney-General and the State House Commission," and "housing for employees of State Institutions operated by the Department of Institutions and Agencies at a site or sites specified by the Commis-

sioner of Institutions and Agencies and approved by the State Board of Control of Institutions and Agencies and the State House Commission." And the Authority "shall lease or otherwise contract for the use of space in projects or parts thereof but such leases shall be only to, and such contracts only with, the State or any departments, agencies, and instrumentalities of the State." *Section* 3.

The Authority consists of three members, appointed by the Governor with the advice and consent of the Senate, and removable by the Governor for cause after a public hearing. *Sections* 4, 6. It has capacity to sue and be sued in its own name, to contract in the performance of its duties and the execution of its powers, and to use a common seal: and it is empowered to issue bonds, and "to provide for the rights of the holders thereof as provided" in the act; to acquire, hold and dispose of personal property in the exercise of its powers and the performance of its duties, and to acquire by purchase or otherwise, or by the exercise of the right of eminent domain as therein provided, "any land and other property which it may determine is reasonably necessary for any project, including public lands, parks, playgrounds, reservations, highways," and so on, and "to hold and use the same and to sell, convey, lease or otherwise dispose of property so acquired, [when] no longer necessary" for its corporate purposes; to acquire, construct, maintain, furnish and operate "a project or projects"; to lease "any project or part thereof"; to "contract for the use" of space and "for services to be rendered" by the Authority "in connection with any project," but "such leases shall be only to, and such contracts only with, the State or any departments, agencies, and instrumentalities of the State"; to "establish, alter, charge and collect rents and other charges for the use of any project or part thereof or for any services rendered" by the Authority "in connection therewith at reasonable rates to be determined" by the Authority "for the purpose of providing for the payment of the expenses" of the Authority, "the construction, improvement, repair, equipping, furnishing, maintaining and operation of its facilities and prop-

erties; the payment of the principal of and interest on its obligations and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such obligations"; to adopt by-laws for the regulation of its affairs and the conduct of its business, and to establish rules and regulations for the use of any project; to hire personnel and all necessary administrative and technical skills and services, and fix compensation for the same; and, subject to approval by the Governor, apply for and accept federal grants "to meet any expenses connected with the purposes" of the act. *Sections* 10, 11.

The departments, agencies, and instrumentalities of the State are severally empowered "by proper resolution or act, or acting by or through its director or other chief executive officer," to "enter into any lease with the Authority for any project or part thereof," or contract for the use of space in a project, or for the services to be rendered by the Authority in connection with a project, "for such period of time, specified or unlimited, and upon such terms and conditions as are deemed necessary in order to provide the space or service contemplated by such lease or contract," and undertake the payment to the Authority of "any rents or other charges" for the facility. Such department, agency or instrumentality of the State is "authorized and directed to do and perform any and all acts or things necessary, convenient or desirable to carry out and perform every such contract and to provide for the payment or discharge of any obligation thereunder in the same manner as other obligations of such department, agency, or instrumentality of the State"; and "Any such contract shall be valid and binding upon the department, agency, or instrumentality of the State, notwithstanding that no appropriation was made or provided to cover the cost or estimated cost of the contract." *Section* 12.

The Authority is empowered to issue its negotiable bonds "from time to time  *  *  *  for any of its corporate purposes"; and, except as may be "otherwise expressly provided by the Authority, every issue of bonds shall be general obligations payable out of any moneys or revenues of the

Authority, subject only to any agreements with the holders of particular bonds pledging any particular moneys or revenues." *Section* 17 (*a*), (*b*). The bonds shall be authorized by resolution of the Authority, and shall mature at such time or times, bear interest at such rate or rates not exceeding 6% per annum, and be subject to such terms of redemption as such resolution may provide. *Section* 17 (*e*). In order to secure the payment of its issued bonds, the Authority is given power, as a constituent part of the contract with the bondholders, these among others, to "pledge all or any part of its rents or revenues to which its right then exists or may thereafter come into existence, and the moneys derived therefrom, and the proceeds of bonds"; to "covenant against pledging all or any part of its rents or revenues, or against mortgaging all or any part of its real or personal property then owned or thereafter acquired, or against permitting or suffering any lien or [sic] such rents, revenues or property"; to "covenant with respect to limitations on its right to sell, lease or otherwise dispose of any project or any part thereof, or any property of any kind"; to "covenant as to the payment of the principal of or interest on the bonds, or any other obligations, as to the sources and methods of such payment, as to the rank or priority of any such bonds or obligations with respect to any lien or security or as to the acceleration of the maturity of any such bonds or obligations"; to "covenant against extending the time for the payment of bonds or interest thereon"; to "covenant as to the rates of rents and other charges to be established and charged, the amount to be raised each year or other period of time by rents or other revenues and as to the use and disposition to be made thereof"; to "create or authorize the creation of special funds or moneys to be held in pledge or otherwise for construction, operating expenses, payment or redemption of bonds, reserves or other purposes and to covenant as to the use and disposition of the moneys held in such funds"; to provide "for the rights and liabilities, powers and duties arising upon the breach of any covenant, condition or obligation"; to "vest in a trustee or trustees such prop-

erty, rights, powers and duties in trust for the bondholders, as the Authority may determine, which may include any or all of the rights, powers and duties of the statutory trustee appointed by the holders of bonds pursuant" to the act; and "to make such covenants to do or refrain from doing such acts and things as may be necessary or convenient or desirable in order to better secure the bonds or which, in the absolute discretion of the Authority, will tend to make the bonds more marketable, notwithstanding that such covenants, acts or things" are not enumerated therein. *Section* 17 (*g*).

Bonds may be issued "without obtaining the consent of any department, division, commission, board, bureau or agency of the State, and without any other proceeding or the happening of any other conditions or things than those proceedings, conditions or things which are specifically required by this act." *Section* 17 (*i*). The Authority is given power to "mortgage real property." *Section* 17 (*j*). And it may provide for the appointment of a "statutory trustee," in the event of a default for a period of 30 days in the payment of the principal or interest accruing on any of the issued bonds, for the pursuit of remedies therein provided—this, among others: by civil action in lieu of prerogative writ or by any other civil action or suit, to "enforce all rights of the holders of such bonds, including the right to require the Authority to charge and collect rents and other revenues adequate to carry out any contract as to, or pledge of, such rents and revenues, and to require the Authority to carry out and perform the terms of any contract or covenant with or for the benefit of the holders of such bonds or its duties under" the act. It is also provided that the trustee "shall be entitled as of right to the appointment of a receiver of any part or parts of the project the rents or other revenues of which are pledged for the security of the bonds"; and such receiver may take possession, proceed with the construction, and operate such part or parts of the project and receive the rents subject to any pledge or agreement made by the Authority. *Section* 18.

The issued bonds "shall not be deemed to constitute a debt or liability of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision"; and all such bonds shall be so endorsed. *Section* 19. But the State of New Jersey "does pledge to and agree with the holders of the bonds" that the State "will not limit or restrict the rights" thereby "vested in the Authority to maintain, construct, reconstruct and operate any project as defined" in the act, or to "establish and collect such rents, fees, receipts or other charges as may be convenient or necessary to produce sufficient revenues to meet the expenses of maintenance and operation thereof and to fulfill the terms of any agreements made with the holders of bonds authorized" by the act, "or in any way impair the rights or remedies of the holders of such bonds until the bonds, together with interest thereon, are fully paid and discharged." *Section* 20. The exercise of the powers granted by the act is deemed to be "in all respects for the benefit of the people of the State"; and "as the operation and maintenance of projects by the Authority will constitute the performance of a governmental function," the Authority's projects, property and income, and the bonds issued under the act and the income therefrom, are rendered immune from "any taxes or assessments." *Section* 21. The bonds are made legal security. *Section* 22. The Authority is required to make an annual report of its activities and financial operations to the Governor and the Legislature. *Section* 23.

In the exercise of the purported statutory grant of power, the Authority issued bonds in the aggregate sum of $675,000; and by resolution adopted December 18, 1952 it made provision for the issuance of its Revenue Refunding and Improvement Bonds Project A in the same amount for the purpose of redeeming the previous issue and to pay the cost of erecting the "Somerville Barracks" for the State Police. The Authority has entered into a "lease" with the State of New Jersey for 12 sites to be used "for Motor Vehicle stations," for a term of 20 years at an annual rental of $33,374, or an aggregate rental for the term of $667,480, "exclusive

of other charges made in said lease," *i. e.*, "the maintenance and repair of the stations so rented and all costs incident to the ownership and operation thereof during the term including taxes, if any, and insurance premiums." And the lessee covenanted that "in the preparation of each annual budget," it would include the amount of the annual rentals "in the budget as the basis of the current appropriation to be made" to it. The Authority has also entered into "leases" with the State for the properties known as "Princeton Barracks" and "Somerville Barracks" which obligate the State to pay, in addition to the fixed rental, "all costs incident to the ownership and operation thereof during the term including taxes, if any, and insurance premium." It is stipulated that the "total aggregate rentals" of these leases, "when added to the debts and liabilities" of the State, "exceed one percent of the total amount appropriated by the general appropriation law for the year 1952."

The foregoing constitute the subject matter of the first count of the complaint.

The second count impugns the validity of a lease made September 12, 1952, between Prentice Realty Co. of Trenton and the "State of New Jersey, by the Director of the Division of Purchase and Property, on behalf of the Division of Motor Vehicles," for "the entire new building to be erected on the east side of 222 West State Street," in Trenton, "and the entire existing two-story building in the rear," for the term of ten years from March 1, 1953, at the yearly rent of $38,811, or an aggregate of $388,110. The lessor undertook to erect "a new building" and to "alter the present rear building to conform with the new structure," to provide heat, electricity, gas, water and janitor service, and so on, and "take care of all inside and outside structural repairs" and "maintain the heating, plumbing and wiring systems" during the term of the lease, all at its own expense. The State may cancel the lease after five years, by giving six months' notice in writing of its election so to do, if (1) "the new State office building will have been erected on the State-owned site on West State Street, Trenton," and (2) "the department occu-

pying" the demised premises shall "move into said office building." The contention is that this latter lease purports to create a State debt or liability in excess of the constitutional debt limitation, and requires appropriations in disregard of the constitutional restrictions upon the appropriation of the State's moneys. It was stipulated on the oral presentation of the cause in the Superior Court that this lease "is to be considered as part of the facts in this motion."

The Authority has prepared plans and specifications for the erection of a State office building in Trenton having a floor area of 200,000 square feet; and it is now negotiating with the State Division of Purchase and Property for the "rental" of the proposed structure. It has also prepared plans and specifications for the erection of an Administration Building on the campus of the New Jersey State Teachers College at Trenton for the use of the State Department of Education, and is now arranging for the "rental" of the building.

The complaint prayed that the Authority Act be adjudged constitutionally insufficient, and the action taken by the Authority thereunder void, and for appropriate relief accordingly. The Superior Court found no constitutional infirmity in the statute, and the proceedings taken thereunder to be valid and effectual; and there was judgment for defendants on both counts. *McCutcheon v. State Building Authority,* 25 *N. J. Super.* 171 (*Law. Div.* 1953).

If the course taken here be deemed an indirect pledge of the State's credit, it is yet within the State's constitutional province if not in contravention of *Article* VIII, *Section* II, *paragraph* 3 of the 1947 *Constitution,* forbidding the creation in any fiscal year of "a debt or debts, liability or liabilities" of the State, which together with any previous "debts or liabilities" shall exceed "at any time" one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law "for some single object or work distinctly specified therein," and, regardless of any limitation relating to taxation in the Constitution, such law shall pro-

vide "the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted," and be "approved" by the voters at a general election referendum. The State may consummate a project for the public good and welfare by means of an instrumentality such as we have here, supported by the State's guaranty of the payment of the bonds issued by the instrumentality to that end, if there be compliance with this constitutional directive. That would not constitute a loan of the State's credit within the interdiction of the particular limitation. There would not in that case be a pledge of the State's credit to private enterprise, but rather a debt or liability incurred by the State in the fulfillment of an essential public function by means of the body corporate created by the State itself for that very purpose. *Behnke v. New Jersey Highway Authority*, 13 *N. J.* 14 (1953).

But the statute under review does not represent an exercise of state power conformably to the cited constitutional limitation. While in form a way of providing the State with leasehold interests in building facilities for public use, in reality the design of the act is to enable the State by contracts of purchase to acquire for state use buildings possessed and constructed by the Authority by means of bond issues sustained by the State's promise to supply in the guise of rentals sufficient money to liquidate the bonds, available only through the medium of annual appropriations. And this in disregard of the constitutional debt limitation and the restraints laid by the organic law upon the appropriation process. There is no pretense of conformance with the debt limitation provision; there was no submission of the project to the electorate under *Article* VIII, *Section* II, *paragraph* 3. The legislation proceeds upon the hypothesis that the fulfillment of the project will not burden the State with a debt or liability within the constitutional sense. But in this the accent is on the external appearance rather than the substance. The label is unimportant; it is

not the form but the essence that controls. It is an obvious truism that constitutional limitations may not be set at naught by indirection.

Here, the avowed purpose is the provision of additional buildings for the use of the State and its departments, agencies and instrumentalities in the fulfillment of public functions. The Authority is directed to "lease or otherwise contract" for "the use of space in projects," but only with the State or its "departments, agencies, and instrumentalities"; and it is empowered to establish and collect "rents and other charges" for the use of the project and the service rendered, "at reasonable rates * * * for the purpose of providing for the payment of the expenses" of the Authority, the construction, furnishing, maintenance and operation of the facilities, and the payment of the "principal of and interest on its obligations and to fulfill the terms and provisions of any agreements made with the purchasers or holders of any such obligations," and also to covenant as to "the amount to be raised each year or other period of time by rents or other revenues and as to the use and disposition to be made thereof," and to create or authorize the creation of "special funds or moneys" to be held as "pledge or otherwise" for construction, operating expenses and the payment or redemption of bonds.. The bonds are payable out of the "moneys or revenues" of the Authority, and the rents may be pledged as security for their payment. The departments and agencies of the State are given the reciprocal capacity of lease and contract with the Authority, and to undertake the payment to the Authority of "any rents or other charges" thereby established. Such contracts are made "valid and binding" upon the particular department or agency notwithstanding the lack of an appropriation "to cover the cost or estimated cost of the contract." The Authority has the power to mortgage its real property. And the State makes a pledge to the holders of the bonds that there will be no limitation or restriction of the Authority's rights thereby conferred to "establish and collect such rents, fees, receipts or other charges" as may be necessary to "produce sufficient revenues"

to defray operating expenses and "fulfill the terms" of its "agreements" with the holders of the bonds; and the bondholders are assured of a civil remedy to enforce their bonds and "to require" the Authority "to carry out and perform the terms" of its "contract or covenant" with them or for their benefit.

There is no limit to the debt or liability that may be incurred by the Authority.

Thus, the Authority is constituted an instrumentality of the State designed to authorize the construction of building facilities for the use of the State that, if accomplished by the State directly, would be ineffectual as in excess of the constitutional debt limit, absent the referendum approval of the electorate in consonance with the debt-limitation provision. Such is indubitably the nature of the projects undertaken by the resolution of the Authority now under review—a contrivance to accomplish that which by the same means the State could not do directly.

The property of the Authority becomes the property of the State. The State conceived the Authority to serve what was deemed to be an essential public need; and the Authority remains subject to control and dissolution by its sovereign creator, save only as restrained by the constitutional immunity of the holders of the bonds and other third parties from the impairment of the obligation of contract. Upon dissolution the Authority's property passes to the State. By this device the purchase price of the property is to be paid by the State, through appropriations made to the particular department, agency, or instrumentality in the exercise of an essential governmental function. While the payments thus made by the State through its governmental agency take the form of "rentals," they are in substance and effect the purchase price of the property, for they are to be sufficient in amount to defray the Authority's operating expenses and in the end to liquidate the principal of the bonds and the interest accruing thereon. Were this not so, the Authority would be unable to function, for it would have no other source of revenue

adequate to retire the bonds. The Authority may "lease" only to the state departments, agencies and instrumentalities, and at a "rental" determined by this standard. These are not leases, as in the case of the Prentice Company, but contracts of purchase by the sovereign for public use; the "rentals" constitute appropriations made by the State, not alone to provide operating expenses, but in *quantum* sufficient for the ultimate payment and retirement of the bonds. A true lease rental is compensation for the use of the property, not the consideration price for its purchase.

The principle was applied by the old Court of Errors and Appeals, although under different circumstances, in the case of *Wilson, Attorney-General v. State Water Supply Commission*, 84 *N. J. Eq.* 150 (*E. & A.* 1915). There, Mr. Justice Garrison considered the particular transaction in the context of the constitutional scheme for the payment of the State's obligations by means of an appropriation. He said of the predecessor debt-limitation provision of the 1844 Constitution (*Article IV, Section VI, paragraph* 4):

"It is at least a reasonable construction that what the framers were guarding against were not suits and actions against the legislature, which they knew could not be brought, but debts incurred by the legislature which they knew might be paid by appropriations if they were permitted to be contracted. That this was no fanciful anticipation is shown by the contract now before us which provides for a sinking fund for the payment of the mortgage debt, the first source of which is: '(1) Any and all moneys which shall from time to time be appropriated by any legislature of the State of New Jersey towards the principal of said bonds or any part thereof.' An additional sinking fund is provided after five years, 'this sinking fund shall be provided (1) from any appropriations made by the legislature of the State of New Jersey.' Finally, it is provided that the mortgage debt shall be made out of the property 'unless a special appropriation be made by the legislature of the State of New Jersey.' * * * It is in this connection of significance to inquire what was the object of these appropriations that were to be made 'from time to time,' first to the original sinking fund, then five years later to the additional sinking fund, and finally to the satisfaction of the mortgage debt. Were they gifts—or were they payments made in the reduction or discharge of a debt?"

He continued:

"Such a provision should be construed so as to effectuate, not to frustrate, its object, which latter result is surely accomplished if the propriety of a purchase of this magnitude can, by a general law, be turned over bodily to four or five citizens, however estimable, instead of being, as the constitution requires, passed upon by the legislature itself, *i. e.*, by the senate, the house of assembly and the governor. For, it is only when this has been done, and the specific object sought, together with the ways and means, have been enacted into a law that the referendum provided by the constitution can be had. It cannot be that the legislature by a wholesale abdication of its constitutional functions can defeat this unique provision of the organic law."

And the Maine Supreme Court invoked the same principle under somewhat similar circumstances. The holding there was that the "so-called lease is not in legal effect a lease, it is a contract of purchase"; the "total amount of so-called rental is the purchase price the State is to pay for the property," and

"When paid in full it will liquidate the entire indebtedness of the Building Authority. Being a contract of purchase, obligating the State to pay the purchase price, unless the entire amount thereof is to be paid pursuant to an appropriation presently made from funds or revenues *currently available* therefor, such contract of purchase would in the constitutional sense be a liability created by the Legislature on behalf of the State. It would constitute a liability which would have to be included with the existing debts and liabilities of the State in determining whether or not they exceed the $2,000,000 limit set forth in Section 14 of Article IX of the Constitution. If such contract price in and of itself, or together with the existing debts and liabilities of the State, should exceed the constitutional debt limit, the so-called lease would be void. A contract which obligates the State to pay money over a period of years for the purchase of property, creates a liability. It makes no difference whether you call the payments the State is obligated to make rental or instalments on the purchase price, the legal effect is the same. If you vitiate the provision for the so-called lease and payment of rental the Building Authority cannot function. The ultimate source of all funds for the liquidation of the indebtedness of the Building Authority is the State of Maine. Under the so-called lease, the State obligates itself to furnish them. This creates a liability. If the aggregate amount of it either by itself or together with existing obligations exceeds the debt limit of the

State, it is beyond the power of the Legislature to impose it."
*Opinion of the Justices, Me.*, 79 A. 2d 753, 756 (*Sup. Jud. Ct.*
1951).

Here, unlike those that have gone before, the subject of
the Authority's domain is not a toll or self-sufficient facility;
the Authority is obliged to lease its building facilities to the
State or its departments, agencies, or instrumentalities, and
the State Treasury is the sole source of its revenue, in the
form of legislative appropriations utilized for the payment
of an agreed "rental" in amount adequate to defray the
Authority's operating expenses and service and effect the
ultimate retirement of the bonds. Thus, the Authority is
non-revenue producing; it is an instrumentality of the state
whose function is wholly dependent upon state moneys raised
by taxation; the leasing device is in essence an installment
purchase by the State of office building and personnel-housing
facilities. Such a contract with a department or agency of
the State would be a contract with the State itself. Of this
there can be no doubt.

The Authority maintains that it is an "independent public
corporation," and, such being the case, "the difference in
sources of revenue loses any significance since dealings be-
tween the State and the Building Authority fall into the
same category as those between the State and any private
corporation or between the Turnpike Authority and any
toll-payer."

But the analogy is misconceived. There is, for the
reasons stated, a radical difference in the relationship between
the State and the Authority and the State and a private
corporate lessor, *e. g.*, Prentice Realty Co., under the lease
referred to *supra*. The Authority is not an independent
autonomous public corporation. It may lease its building
facilities only to the State, its departments, agencies, and
instrumentalities. As we have seen, the Motor Vehicle
inspection stations and the State Police barracks are re-
quired to be erected on sites selected by the respective
departmental heads and approved by the Attorney General

and the State House Commission, and the housing facilities, on sites chosen by the Commissioner of Institutions and Agencies and approved by the State Board of Control of Institutions and Agencies and the State House Commission. And, quite apart from other considerations heretofore adverted to, the State's taxing power is the sole source of its revenue.

█ █ The constitutional debt-limitation provision is not limited in quality and scope to debts enforceable by action. It has in view the temptation or inducement and incentive to make appropriations for "debts" beyond the prescribed amount, unless approved by the people in the manner ordained. Moral and ethical compulsions are not to be allowed to override the constitutional safeguard against improvidence and the integrity of the State's economy. Said Justice Garrison in *Wilson, Attorney-General, v. State Water Supply Commission*, cited *supra*:

"Common usage reflects common experience, which teaches us that the vast majority of debts are paid without any reference to their enforceable character. * * * Obviously, there are very practical reasons why the word 'debt' in the constitution should be construed to include those payable by legislative appropriation; it is against the construction of such debts that the constitutional provision is aimed and not against voluntary appropriations for any lawful object."

█ In principle, the particular clause of the 1947 Constitution is the same as its predecessor provision of the 1844 Constitution; and it is fairly to be presumed that the incorporation of the principle in the current Constitution constituted acquiescence in the long-standing judicial interpretation of the prior provision. *State v. De Lorenzo*, 81 *N. J. L.* 613, 623 (*E. & A.* 1911).

█ The course pursued here is at variance with the essential quality and meaning of the constitutional debt limitation. The interpretation offered by the Authority would do violence to the spirit of the provision and render it abortive. These constitutional limitations, this and the provisions imposing restraints upon the appropriation process,

are the fruits of the bitter experiences of the past; and we are not at liberty to impair or nullify them and thus open the door to the very abuses and dangers to the State's economy they were designed to avert. The history of state government proves the wisdom and the urgent need of rigid restrictions upon state borrowing.

In *Kelley v. Earle*, 325 *Pa.* 337, 190 *A.* 140, 146 (*Sup. Ct.* 1937), the court conceded that if the transaction constituted "an outright purchase of property to be paid for in the future, it would undoubtedly be within the constitutional objection, but it is not a purchase nor does it have the attributes of a purchase." This is the essential difference between that case and this. There, after an earlier holding that there was a sale and not a lease (320 *Pa.* 449, 182 *A.* 501), the contrary view was reached on the basis of "new and additional facts"—these in particular: The projects totaled $60,000,000. of which the federal government "will furnish, without reimbursement, 45 per cent"; many of the projects would be self-liquidating, *i. e.*, the revenues would be "sufficient to pay the bonded debt and interest charges over a period of time"; the Authority would receive from the several counties of the state income then aggregating $7,289,030.42 for a period of a year and a half, which would be increased after the building of the proposed additions to the state's hospitals and penal and correctional institutions, and revenue from the counties "does not come from the State"; the lease considered on the earlier presentation of the case provided that "at the end of a definite period, upon compliance with the contract, the property leased was to be deeded to the Commonwealth," and thus there was "a sale [and] not a lease," while the instrument under review on the hearing to open the decree "is a straight lease for a recurring necessity"; the "land leased is not deeded to the Commonwealth; it is still held by the Authority, an independent public corporation," and there was not "the outright purchase of an improvement, but a lease of an improvement on the payment of a moderate annual rental," and "No title under the leases or agreements passes to the Commonwealth,"

but "remains with the Authority." And the Pennsylvania Constitution provided that no "debt" shall be created by or on behalf of the State, except to supply "casual deficiencies." Our own also has the broader term "liability." The Authority there was created to construct permanent public works and improvements, such as sewers, water works, public buildings, airports, highways, and the like, and thereby, incidentally, it is said in the opinion, to alleviate unemployment attending the great economic depression of that period. Here, we have "the attributes of a purchase"; such is the very essence of the plan. It is immaterial in this regard that title remains in the Authority; the corporate entity holds the property for the State. Such a distinction under the circumstances here would be wholly artificial and illusory.

These cases from foreign jurisdiction exemplify the principle which we deem applicable here: *State v. Volusia County School Building Authority, Fla.*, 60 *So. 2d* 761 (*Sup. Ct.* 1952); *State Office Building Commission v. Trujillo*, 46 *N. M.* 29, 120 *P. 2d* 434 (*Sup. Ct.* 1941); *State ex rel. Public Institutional Building Authority v. Griffith*, 135 *Ohio St.* 604, 22 *N. E. 2d* 200 (*Sup. Ct.* 1939); *People ex rel. Greening v. Green*, 382 *Ill.* 577, 47 *N. E. 2d* 465 (*Sup. Ct.* 1943); *Loomis v. Keehn*, 400 *Ill.* 337, 80 *N. E. 2d* 368 (*Sup. Ct.* 1948); *State ex rel. Sawyer v. Neffner*, 137 *Ohio St.* 309, 29 *N. E. 2d* 215 (*Sup. Ct.* 1940). See, also, *Opinion of the Justices, Me.*, 80 *A. 2d* 869 (*Sup. Jud. Ct.* 1951), where the Maine Supreme Judicial Court upheld the constitutionality of an act creating a school building authority empowered to acquire and make leases for schools to town or community school committees.

The observation in the Pennsylvania case of *Kelley v. Earle*, cited *supra*, that it is never "an illegal evasion" to accomplish a desired result, "lawful in itself," by discovering a "legal way" to do it, begs the question and is of no aid whatever on this inquiry, for it presupposes a result "lawful in itself." By the device used in the case now before us, the constitutional debt-limitation provision would be subverted, and made utterly vain.

We are concerned here, not with leases, but rather with installment purchase contracts under the guise of leases, to circumvent this basic limitative provision.

And it is fundamental in the Constitution that, while the Legislature may within constitutional limits, lay a contractual obligation upon the State, one Legislature cannot charge succeeding Legislatures with the duty of making appropriations.

The 1844 Constitution merely ordained that "No money shall be drawn from the treasury but for appropriations made by law." *Art.* IV, § VI, *par.* 2. The 1947 Constitution provides for "one general appropriation law," and directs that "No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor." *Art.* VIII, § II, *par.* 2.

We have no occasion now to consider the validity of the Prentice lease. The record is not sufficient for that purpose. As stated *supra*, the parties stipulated that this lease was merely "to be considered as part of the facts in this motion." There is no showing of the relationship of the reserved rental, however it may be viewed, to the constitutional debt limitation, at the time the lease was made.

The resolutions of the Authority and all its leases, contracts and proceedings in relation to the subject matter of this review are null and void; the judgment of the Superior Court is reversed, and the finding that the Prentice lease is "constitutional" and "valid" vacated, and the cause is remanded for judgment accordingly.

JACOBS, J., with whom WILLIAM J. BRENNAN, JR., J., joins (dissenting). In 1947 the constitutional delegates drafted and the citizens approved our basic instrument of government which was well designed to protect the liberties and further the welfare of all of the people of our State.

In traditional fashion it vested in the Legislature, with the concurrence or above the veto of the Governor, comprehensive power to enact laws, subject only to the extraordinary power of the judiciary to determine them unconstitutional. In exercising this power courts are governed by limitations which, though well recognized, cannot be restated too often. Under democratic principles, matters of wisdom and policy are the exclusive concern of the Legislature which is fully accountable to the electorate acting at the polls. Consequently, a law may not be stricken solely because the court thinks it dangerous and unwise. When duly enacted it is presumptively valid, and only when it clearly appears to run counter to an express restrictive provision of the Constitution will it be declared invalid in a case actually requiring such determination. See Garrison, J., in *Attorney-General v. McGuinness*, 78 *N. J. L.* 346, 371 (*E. & A.* 1910); Brandeis, J., in *Ashwander v. Tennessee Valley Authority*, 297 *U. S.* 288, 341, 56 *S. Ct.* 466, 80 *L. Ed.* 688, 707 (1936).

The majority opinion concerns itself with the constitutional debt limitation embodied in *Article* VIII, *Section* II, *paragraph* 3, and we shall do the same. That paragraph provides that the Legislature may not create a debt or liability which, together with preexisting debts, exceeds 1% of the amount appropriated in the general appropriation act for that year, unless it is authorized by a law which provides the means for payment of interest, and discharge of principal within 35 years, and has been duly approved by a referendum of the people. It was a continuation of the policy of constitutional debt limitation found in *Article* IV, *Section* VI, *paragraph* 4 of the *Constitution of* 1844. The history of the times renders evident the purpose of the provision in the 1844 Constitution. Early in the 19th Century many of the states borrowed for the development of highways, canals and other internal improvements. Business boomed, money was plentiful, and the states had little difficulty in selling their bonds. By 1840 the bonded indebtedness of the states exceeded the then tidy sum of $200,000,000. However, with the aftermaths of the financial crisis of 1837, the borrowing

states found themselves in difficulties and many states defaulted on their bond obligations. See *Rep. No. 296, House of Rep., 27th Cong.* (1843); *Dewey, Financial History of the United States* 243 (1934); *McGrane, Foreign Bondholders and American State Debts* (1935). In 1842 Rhode Island adopted a constitutional debt limitation and within the next two years New Jersey, although it had itself escaped difficulties, did likewise. See *Tilton, Constitutional Limitations on the Creation of State Debt,* 2 *Const. Conv.* 1947, 1708 (1951). See also *Requirements for State Bond Referenda,* in 10 *New York State Constitutional Convention Committee, Problems Relating to Taxation and Finance,* at *p.* 81 (1938). That the delegates to the 1844 Constitutional Convention had in mind liability such as state bonded indebtedness finds support not only from the pertinent history but also from the actual language used by them, particularly the specific requirement that the law authorizing the debt make provision "to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within thirty-five years from the time of the contracting thereof."

The appellant has advanced the contention that within the meaning of the debt limitation provisions of the 1844 and 1947 Constitutions a lease creates an immediate liability in the aggregate amount of all of the future rents which will become due until the date of expiration. Although there are some supporting decisions the overwhelming weight of authority is to the contrary. See *Ambrozich v. City of Eveleth,* 200 *Minn.* 473, 274 *N. W.* 635, 112 *A. L. R.* 269 (*Sup. Ct.* 1937); *City of Los Angeles v. Offner,* 19 *Cal. 2d* 483, 122 *P. 2d* 14, 145 *A. L. R.* 1358 (*Sup. Ct.* 1942); *Dean v. Kuchel,* 35 *Cal. 2d* 444, 218 *P. 2d* 521 (*Sup. Ct.* 1950); *Jefferson School Township v. Jefferson Township School Building Co.,* 212 *Ind.* 542, 10 *N. E. 2d* 608 (*Sup. Ct.* 1937); 112 *A. L. R.* 278; cf. *Kelley v. Earle,* 325 *Pa.* 337, 190 *A.* 140 (*Sup. Ct.* 1937); *Walinske v. Detroit-Wayne*

*Joint Bldg. Authority*, 325 *Mich.* 562, 39 *N. W.* 2d 73 (*Sup. Ct.* 1949); *Heberer v. Board of Com'rs. of Chaffee County*, 88 *Colo.* 159, 293 *P.* 349 (*Sup. Ct.* 1930); *Walla Walla v. Walla Walla Water Company*, 172 *U. S.* 1, 19, 19 *S. Ct.* 77, 43 *L. Ed.* 341, 349 (1898); 15 *McQuillin, Municipal Corporations* (3rd ed. 1950), 394.

In *Gardiner v. William S. Butler & Co.*, 245 *U. S.* 603, 605, 38 *S. Ct.* 214, 62 *L. Ed.* 505, 506 (1918) Justice Holmes pointed out that the law as to leases was "not a matter of logic *in vacuo*" but "a matter of history that has not forgotten Lord Coke." Whatever we may now think of the feudal origins of the common-law principles governing the landlord-tenant relationship, they admittedly did not recognize future rent as a presently existing debt or liability. See 1 *Tiffany, Landlord and Tenant* (1910), § 166. Thus in *Bordman v. Osborn*, 23 *Pick.* 295, 40 *Mass.* 295, 299 (*Sup. Jud. Ct.* 1839) Chief Justice Shaw expressed the prevailing common-law concepts as follows:

"Rent is a sum stipulated to be paid for the actual use and enjoyment of another's land, and is supposed to come out of the profits of the estate. The actual enjoyment of the land is the consideration for the rent which is to be paid, and, therefore, if the lessee is evicted before the rent becomes due, in whole or in part, it is a good answer to a claim for rent, by an action of debt or covenant, or by distress. 1 *Saunders*, 204, *note*. From this it seems clear, that although there be a lease, which may result in a claim for rent, which will constitute a debt, yet no debt accrues until such enjoyment has been had; because, says Lord Coke, in discussing the effect of a release, a debt is merely a thing in action, and, therefore, if a man be bound to the payment of a debt, at a future time, a release of all actions by the obligee, is a perpetual bar, for 'albeit no action lyeth for the debt, because it is *debitum in praesenti, quamvis sit solvendum in futuro*, yet because the right of action is in him, the release of all actions is a discharge of the debt itself.' *Co. Lit.* 292b. And the next section is still more explicit. But if a man leaseth land for a year, reserving a rent payable at Michaelmas, and before that time releaseth all actions, yet after said feast he shall have an action of debt. The reason, says Lord Coke, is, that it was neither *debitum* nor *solvendum* when the release was made; for if the land be evicted from the lessee, before the rent become due, the rent is avoided, for it is to be paid out of the profits of the land. *Co. Litt.* 292b."

Similarly in *Block v. Bell Furniture Co.*, 111 *N. J. Eq.* 551, 557 (*E. & A.* 1932), our own Justice Case quoted approvingly from *In re Roth & Appel*, 181 *F.* 667 (*C. C. A.* 2 1910):

"Rent is a sum stipulated to be paid for the use and enjoyment of land. The occupation of the land is the consideration for the rent. If the right to occupy terminate, the obligation to pay ceases. Consequently, a covenant to pay rent creates no debt until the time stipulated for the payment arrives. The lessee may be evicted by title paramount or by acts of the lessor. The destruction or disrepair of the premises may, according to certain statutory provisions, justify the lessee in abandoning them. The lessee may quit the premises with the lessor's consent. The lessee may assign his term with the approval of the lessor, so as to relieve himself from further obligation upon the lease. In all these cases the lessee is discharged from his covenant to pay rent. The time for payment never arrives. The rent never becomes due. It is not a case of *debitum in praesenti solvendum in futuro*. On the contrary, the obligation upon the rent covenant is altogether contingent. *Watson v. Merrill*, 136 *F.* [359] 362, 69 *C. C. A.* 185, 69 *L. R. A.* 719 [8 *Cir.*]. See, also, *Coke on Littleton*, 292b; *Wood v. Partridge*, 11 *Mass.* [488] 492; *Bordman v. Osborn*, 23 *Pick.* [295] 299."

Wholly apart from the foregoing there are persuasive modern day considerations which support the view that the delegates to the Constitutional Convention of 1947 never contemplated the aggregation of future rents as a debt or liability within *Article* VIII, *Section* II, *paragraph* 3. In the first place, generally accepted accounting practice throughout the country did not encompass future rentals as debts or liabilities; corporate balance sheets would have been examined in vain for reference to lease rentals which would become payable in future years. Secondly, the State of New Jersey had for years prior to the 1947 Convention entered into many long-term leases; though these leases were executed without any specific law supported by referendum, there never had been any suggestion that their execution violated any constitutional provision. And finally, it is hardly conceivable that the inapt constitutional phraseology with respect to payment of "interest" and discharge of "principal" within the stipulated period would have been used as

applicable to the customary leasing by the State of the use of property for public purposes.

The appellant's amended complaint attacks the validity of a lease entered into on September 12, 1952 between the State as lessee and Prentice Realty Co. as lessor. Under the terms of the lease the Realty Co. lets to the State the new building to be erected on the east side of 222 West State Street and the existing building in the rear thereof for a period of ten years at the annual rental of $38,811 to be paid in monthly installments of $3,234.25. The appellant's position apparently is that under this lease a present liability of $388,110 has been created without compliance with the requirements of the Constitution. The lease affords to the State the additional and important advantage of having the premises built to meet its special needs; in other respects it does not differ significantly from the many other outstanding leases of the State. The record before us discloses that the State now occupies space under 173 leases bearing terms ranging up to 50 years. It may be assumed that current annual rentals under these leases are being duly provided for in current annual appropriation laws as provided in *Article VIII, Section II, paragraph 2* of the *Constitution of 1947. Cf. McMahon v. City of Bayonne,* 10 *N. J. Misc.* 1215 (*Sup. Ct.* 1932); *Viracola v. Long Branch,* 1 *N. J. Misc.* 200 (*Sup. Ct.* 1923); *DeBow v. Lakewood Township,* 131 *N. J. L.* 291 (*Sup. Ct.* 1944). Insofar as rentals which may become due in the future years are concerned, they are not present debts or liabilities requiring referenda approval under *Article VIII, Section II, paragraph 3.* We have already indicated that this view is supported fully by the authorities and controlling reasons; indeed, any contrary view would seriously impair the State's outstanding leases and would severely restrict its power to avail itself of the acknowledged advantages of negotiating long-term leases where the public interest dictates such action. As expressed by the State's Director of the Division of Purchase and Property:

"It has been our experience that leases for one and two years result in either rapid increases in rent or wasteful moving. Wher-

ever possible, like any efficient business, we attempt to stabilize our locations, particularly when they are satisfactory, and obtain at least a five year term, with renewal options if possible. The short terms are generally either the longest term which the landlord will give or are on facilities we are anxious to relocate as soon as possible. To attempt to house our departments on a year-to-year basis would be a practical impossibility. If examined on the basis of being theoretically possible, such a policy would entail an exorbitant cost both rentwise and with respect to efficiency, to say nothing of detrimentally affecting the operation of the business of the State. In addition it would cause and create great annoyance and inconvenience to the public who would be unable to keep up with changed locations."

In addition to the Prentice lease, the appellant's amended complaint attacks three leases between the State and the State Building Authority relating to: (1) the Princeton Barracks, (2) the Somerville Barracks and (3) state motor vehicle stations, and also asserts the unconstitutionality of *L.* 1950, *c. 255*, as amended (*R. S.* 52:18*A*–50 *et seq.*). It seems clear to us that any attack on the constitutionality of the statute itself must fail under the principles announced by the court in *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949), recently reaffirmed in *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14 (1953), and generally supported by decisions elsewhere. See *Kelley v. Earle, supra; Walinske v. Detroit-Wayne Joint Bldg. Authority, supra; Nehemkis, The Public Authority: Some Legal and Practical Aspects,* 47 *Yale L. J.* 14 (1937). The statute creates the State Building Authority, an independent entity which is wholly comparable to the Turnpike Authority and the New Jersey Highway Authority. The State Building Authority is authorized to acquire, construct, maintain and operate buildings to be leased to the State, including inspection stations and police barracks at sites designated respectively by the Director of the Division of Motor Vehicles and the Superintendent of State Police with the approval of the Attorney-General and the State House Commission. *R. S.* 52:18*A*–52. The Turnpike Authority and the New Jersey Highway Authority are authorized to acquire, construct, maintain and operate state highways at locations designated

by the State Legislature. *R. S.* 27:23–1; *R. S.* 27:12*B*–2. The suggested differences in the status of the Authorities, as legal entities independent of the State, appear to us to be wholly unrealistic. *Cf. Kelley v. Earle, supra; Greenhalgh v. Woolworth,* 361 *Pa.* 543, 64 *A.* 2*d* 659 *(Sup. Ct.* 1949); *Nehemkis, supra.* The State Building Authority is expressly authorized to issue bonds but its bonds are not those of the State. On the contrary, the statute expressly provides (*R. S.* 52:18*A*–68) that the bonds shall not be deemed to constitute a debt or liability of the State or any political subdivision or a pledge of the faith and credit of the State or any political subdivision. The statute further provides that the bonds shall contain on their face a statement that neither the State nor any political subdivision is pledged to pay principal or interest and that neither the faith and credit nor the taxing power of the State or of any political subdivision is pledged to pay principal or interest. Purchasers of the Authority's bonds can be under no misapprehension whatever; they rely upon the obligation of the Authority, as distinguished from the State, and upon that obligation alone.

Nowhere on the face of the act does the State itself assume any burden except that it will not impair the Authority's functions to the prejudice of bondholders. *R. S.* 52:18*A*–69. But that limited burden might well be deemed existent without express provision, and in any event does not constitute any state debt or liability or any pledge or loan of the State's credit within the Constitution. See *New Jersey Turnpike Authority v. Parsons, supra,* at *p.* 243. Unlike the situation in *Behnke v. New Jersey Highway Authority, supra,* there was no guaranty by the State of the Authority's bonds requiring approval by referendum of the people. The first and only liability of the State, as distinguished from the Authority, occurs when the State actually enters into a lease with the Authority, and the nature and extent of that obligation, if any, can be ascertained only by an examination of the terms of the lease. Thus, if the State were to insist that all future leases with the Authority contain provisions authorizing the State to vacate at will and thus terminate the leases, it would

appear beyond peradventure that the State would incur no obligation thereon except to pay for current use through current appropriations. We assume that the propriety of incurring such obligation would be acknowledged universally.

We come then to the crucial and only remaining issue: are the leases between the Authority and the State relating to the Princeton Barracks, the Somerville Barracks and the state motor vehicle stations to be stricken as violative of the Constitution? Although the majority opinion refers to plans and specifications for a State Office Building in Trenton and an Administration Building on the campus of the New Jersey State Teachers College at Trenton, it is sufficient to note that they are not properly before us for consideration. They are not mentioned in the original or amended complaint and are not ripe for any determination in this proceeding. The lower court had no occasion to pass on them and its actual judgment was properly confined to a determination of the constitutionality of the statute, the validity of the Authority's bonds, and the validity of the four leases, including the Prentice lease, brought into issue by the amended complaint. Insofar as the leases for the Princeton and Somerville Barracks are concerned, we need only refer to the fact that their term is one year with annual renewal options in favor of the State. The State's obligation at most is to pay for current yearly occupancy, which presumably is provided for in current appropriations, and it seems frivolous to suggest that such obligation impairs the letter or purpose of the constitutional provision against loaning the State's credit or the constitutional debt limitation.

The lease relating to the motor vehicle inspection stations is for a period of 20 years commencing on January 1, 1953. It provides that the Authority as lessor lets to the State the 12 inspection stations described therein at stated annual rentals which aggregate $33,374. The lease provides, as do many commercial leases, that the lessee shall operate the leased premises in proper and lawful manner, that the lessee shall pay taxes and assessments on the premises and that the lessee shall keep the premises insured. In the event of

default the Authority may declare the lease void, may take possession of the premises, and obtain the appointment of a receiver. The lessee covenants that in the preparation of each annual budget of the Division of Purchase and Property the annual rental will be included as the basis of legislative appropriation. The lease contains no provision whatever relating to any purchase or other acquisition of title to the property by the State, though it is suggested that by legislative dissolution of the Authority the State may, subject to the rights of bondholders, acquire the property as though purchased; presumably the same may be said of the New Jersey Turnpike, the New Jersey Highway Authority, and similar public authorities, the validity of which is now beyond question. Indeed, every private corporation may be dissolved by its stockholders, thus vesting the corporate property in the stockholders, subject to the payment of debts. Yet it is no longer questioned that leases between stockholders and their corporations, and leases between parent and subsidiary corporations, are leases for all legal purposes. *Cf. Klein v. Board of Tax Supervisors*, 282 *U. S.* 19, 24, 51 *S. Ct.* 15, 75 *L. Ed.* 140, 143 (1930); *Frank v. Frank's, Inc.*, 9 *N. J.* 218, 223 (1952). The 12 inspection stations were formerly rented from private concerns at aggregate rentals of $40,700 per year; the leases thereon were about to expire with threatened substantial increases; and the Authority had the opportunity of acquiring, through options to purchase, stations appraised at $690,000 for the purchase price of $327,100. From a business point of view, it would have been foolhardy for the Authority not to acquire the stations and for the State not to lease them from the Authority; it may be noted that the State has actually received income from the operation of these stations amounting to over $468,000 during the calendar year 1952 and to over $160,000 during the first four months of 1953.

In the leading case of *Kelley v. Earle, supra*, the Pennsylvania Supreme Court dealt fully with the power of its General State Authority, a public body comparable to our State Building Authority, to enter into leases with the State

for the use of property for public purposes. The leases were to be for 30-year terms without any express provisions for any conveyance to the State at their expiration. The court in an opinion delivered by Chief Justice Kephart for all of its members rejected the contention that the transaction between the authority and the state amounted to a prohibited purchase rather than a permissible lease [325 *Pa.* 337, 190 *A.* 146]:

"It is urged that the transaction is in effect a purchase of capital assets by installments. To sustain this conclusion, of necessity we must hold the agreement a sale; we have held the agreement is a lease and nothing more. If this were an outright purchase of property to be paid for in the future, it would undoubtedly be within the constitutional objection, but it is not a purchase nor does it have the attributes of a purchase. The title to the property is in the lessor Authority, it may be subjected to defined uses and purposes by the trustee under the deed of trust; the Commonwealth, under the lease cannot intermeddle with it if a default in the payment of rent exists. The fact that the proposed plan might be termed an evasion of the Constitution would not condemn it unless such evasion was illegal. 'It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it.' *Tranter v. Allegheny County Authority, supra,* 316 *Pa.* 65, at *page* 84, 173 *A.* 289, 297. The bonds of the Authority are to be paid out of its revenues. The credit of the State is not pledged or bargained away."

Many decisions rendered both before and after the adoption of our *Constitution of* 1947 have expressed approval of the principles enunciated in the *Earle* case. See *Greenhalgh v. Woolworth, supra; Dean v. Kuchel, supra; Loomis v. Keehn,* 400 *Ill.* 337, 80 *N. E.* 2d 368 (*Sup. Ct.* 1948); *Jefferson School Township v. Jefferson Township School Building Co., supra; Walinske v. Detroit-Wayne Joint Bldg. Authority, supra;* cf. *Texas National Guard Armory Board v. McCraw,* 132 *Tex.* 613, 126 *S. W.* 2d 627 (*Sup. Ct.* 1939); *Sheffield v. State School Bldg. Authority,* 208 *Ga.* 575, 68 *S. E.* 2d 590 (*Sup. Ct.* 1952). Although the majority opinion suggests factual distinctions from those presented in the *Earle* case, they are clearly without significance; the fact is that the court in the *Earle* case flatly sustained the state's power

to enter into long-term leases with its building authority, for revenue or non-revenue producing property, with a sweeping opinion embracive of far more comprehensive situations than that presented by the actual lease relating to the 12 inspection stations. The majority opinion also quotes from *Wilson, Attorney-General v. State Water Supply Commission,* 84 *N. J. Eq.* 150 (*E. & A.* 1915) and *Opinion of the Justices,* 146 *Me.* ——, 79 *A. 2d* 753 (*Sup. Jud. Ct.* 1951). The *Wilson* case did not deal with any leasing arrangement between the State and a public authority and, as the court has had recent occasion to point out, its language must be confined to its context. See *Salomon v. City of Jersey City,* 12 *N. J.* 379 (1953); *De Caro v. De Caro,* 13 *N. J.* 36 (1953). The Maine expression was merely an advisory opinion as to the validity of pending legislation and the justices did not have the important benefits of factual and legal presentations in an actual case or controversy. See *Frankfurter, A Note on Advisory Opinions,* 37 *Harv. L. Rev.* 1002 (1924). The Maine statute provided that upon construction of the building the state would enter into a lease with the authority; unlike our statute the execution of the lease was mandatory upon the state and upon retirement of the Authority's bonds the property was "to be conveyed to the State"; and unlike the 12 inspection stations the building would be non-revenue producing. The justices, while apparently recognizing that ordinarily a long-term lease would not, within the constitutional debt limitation, create a present liability of aggregate future rentals, concluded that the proposed transaction would actually constitute a contract by the State for the purchase of the building, involving an immediate liability for the purchase price in the amount of the aggregate rentals. Without considering the soundness of the opinion of the justices, it seems to us that the arrangement between the State of New Jersey and the State Building Authority with respect to the 12 inspection stations was an actual lease fully as much as the many unquestioned leases throughout the country from public corporations to governmental bodies and private corporations to

their dominant stockholders. *Cf. New Jersey Turnpike Authority v. Parsons, supra,* at *p.* 243. See *Klein v. Board of Tax Supervisors, supra* [282 *U. S.* 19, 51 *S. Ct.* 16], where the United States Supreme Court noted that "it leads nowhere to call a corporation a fiction. If it is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person and its ownership is a non-conductor that makes it impossible to attribute an interest in its property to its members."

The adverse practical effects and the retrogressive implications of the action taken by the majority have given us concern. The struggle for constitutional reform in New Jersey was hard and long. As early as 1873 the then Governor unsuccessfully recommended that a constitutional convention be held, many later recommendations for constitutional revision likewise failed to bear fruit, and finally our recent Constitutional Convention was convened. In the meantime a century had elapsed, our State had changed from a rural into an industrial community and much had been learned about the operations of government and industry. The delegates to the Convention set about their task of preparing a modern instrument of government which would strengthen each of the three branches and properly equip them for the discharge of their responsibilities in safeguarding the liberties and providing for the welfare of our people. Their completed work has enabled tremendous forward strides by our judiciary, and with sympathetic judicial construction should enable equally forward strides by the coordinate branches of government. In authorizing and executing the actual leases in controversy before us the Legislative and Executive Branches have simply applied sound and economical current business practices without incurring any new state bonded indebtedness or imposing any new taxes, without endangering the State's credit, and without violating any restrictive constitutional policies expressed by the delegates. We fail to find substantial basis for invading their conscientious judgment in a field within their proper domain and in striking down the very limited action

taken by them in the reasonable belief that it would advance the interests of the State and its people. *Cf.* the famous quotation from the opinion of Justice Holmes in *Missouri, Kansas & Texas Railway Company of Texas v. May*, 194 *U. S.* 267, 270, 24 *S. Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904):

"Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

We would affirm the judgment entered below.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD and BURLING—5.

*For affirmance*—Justices JACOBS and BRENNAN—2.